**In re Leroy Deon WHITERS, Debtor.**

**Bank Calumet, Plaintiff,**

**v.**

**Leroy Deon Whiters, Defendant.**

**Bankruptcy No. 04–65856 JPK.**
**Adversary No. 05–6001.**

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

Feb. 3, 2006.

Rebecca Hoyt Fischer, Lewis C. Laderer, Laderer & Fischer, P.C., South Bend, IN, for Plaintiff, Bank Calumet.

David Dabertin, Hammond, IN, for Defendant, Leroy Deon Whiters.

## JUDGMENT DETERMINING DISCHARGEABILITY OF INDEBTEDNESS

J. PHILIP KLINGEBERGER, Bankruptcy Judge.

This adversary proceeding was commenced by a complaint filed by the plaintiff Bank Calumet ("Calumet") against Leroy Deon Whiters ("Whiters") on January 3, 2005. Whiters is the debtor in a Chapter 7 case filed under case number 04–65856 in the United States Bankruptcy Court for the Northern District of Indiana, Hammond Division. Whiters appeared by counsel in the adversary proceeding and filed his answer to the complaint on January 12, 2005. Following customary pretrial proceedings, trial in case was held to the bench on September 8, 2005.

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a) and N.D.Ind. L.R. 200.1. This adversary proceeding is a "core proceeding" as defined by 28 U.S.C. § 157(b)(2)(I), and thus this Court has jurisdiction to enter a final judgment on the complaint.

In this case, Bank Calumet seeks a determination that all, or a portion of, its claim against Whiters is excepted from discharge under 11 U.S.C. § 523(a)(4) and 11 U.S.C. § 523(a)(6).

The Court must first address the legal framework on which Bank Calumet must build its case, a relatively easy task with respect to 11 U.S.C. § 523(a)(4), but an extremely difficult and convoluted endeavor with respect to 11 U.S.C. § 523(a)(6).

### A. *11 U.S.C. § 523(a)(4)*

As applicable to this case, 11 U.S.C. § 523(a)(4) states:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

As the statute states in straightforward terms, one of three legal theories may be utilized to seek to except a "debt"[1] from discharge: (1) if the debt arose from fraud or defalcation while acting in a fiduciary capacity; or (2) if the debt arose from an act of embezzlement; or (3) if the debt arose from an act of larceny.

The "fiduciary capacity" designated in 11 U.S.C. § 523(a)(4) was defined by the United States Supreme Court long ago. In *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 153–154, 79 L.Ed. 393 (1934), it was stated (interestingly enough, in a case involving the alleged conversion of a security interest in a motor vehicle):

The respondent contends that, irrespective of willfulness or malice, the petitioner is within the exception declared by subdivision 4; his liability arising, it is said, from his fraud or misappropriation while acting in a fiduciary capacity. The meaning of these words has been fixed by judicial construction for very nearly a century. *Chapman v. Forsyth*, 2 How. 202, 11 L.Ed. 236, decided in 1844, is a decision to the effect that, within the meaning of a like provision in the Act of 1841 (5 Stat. 440), a factor does not act in a fiduciary capacity; the statute "speaks of technical trusts, and not those which the law implies from the contract." 2 How. at page 208, 11 L.Ed. 236. The scope of the exception was to be limited accordingly. Through the intervening years that precept has been applied by this court in varied situations with unbroken continuity. *Neal v. Clark*, 95 U.S. 704, 24 L.Ed. 586; *Hennequin v. Clews*, 111 U.S. 676, 682, 4 S.Ct. 576, 28 L.Ed. 565; *Noble v. Hammond*, 129 U.S. 65, 68, 9 S.Ct. 235, 32 L.Ed. 621; *Upshur v. Briscoe*, 138 U.S. 365, 11 S.Ct. 313, 34 L.Ed. 931; *Crawford v. Burke*, supra; *Tindle v. Birkett*, supra. Cf. *Cronan v. Cotting*, 104 Mass. 245, 6 Am.Rep. 232; *Clair v. Colmes*,

**1.** "Debt" is defined by 11 U.S.C. § 101(12) to mean "liability on a claim". The term "claim" is defined by 11 U.S.C. § 101(5) to mean either a "right to payment" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment". The original obligation owed by Whiters to Bank Calumet arose from a simple loan transaction in which the Bank advanced funds to the debtor so that the debtor could "refinance" a loan he had obtained from another lender for the purchase of a motor vehicle. There is no contention by the Bank that this original transaction was undertaken by the debtor in circumstances which would cause the debt arising from this loan transaction to be excepted from discharge under any section of 11 U.S.C. § 523(a); nor would the evidence sustain any such claim had it been made. Rather, the "debt" which is the subject of this adversary proceeding arises from Whiters' alleged conduct with respect to dis-

position of a motor vehicle in contravention of the Bank's property interest in that motor vehicle as a result of a security agreement between the Bank and Whiters and/or Whiters' disposition of the title to that vehicle. Thus, to the extent that the Bank's action is viable under either statute, it is sustainable only to the extent of the value of the Bank's proprietary interests in the vehicle, and the extent of the balance of the original loan indebtedness owed by Whiters to Bank Calumet is irrelevant for the purposes of determination of this adversary proceeding.

The principal focus of the Bank's action seems to the Court to be on Whiter's conduct in the context of the handling of the "title" to the subject vehicle, in contrast to Whiter's conduct in relation to the motor vehicle itself. As will become clear later in this opinion, in the Court's view, the result is the same whether one focuses on either the motor vehicle or the title.

245 Mass. 281, 139 N.E. 519. It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio. He must have been a trustee before the wrong and without reference thereto. In the words of Blatchford, J.: "The language would seem to apply only to a debt created by a person who was already a fiduciary when the debt was created." *Upshur v. Briscoe, supra,* at page 378 of 138 U.S., 11 S.Ct. 313, 318. Was petitioner a trustee in that strict and narrow sense?

We think plainly he was not, though multiplicity of documents may obscure his relation if the probe is superficial. The only writing at all suggestive of a trust is the one that is characterized as a trust receipt. What effect would be given to it if it stood alone there is no occasion to consider. It does not stand alone, but is a member of a group which must be read with a collective meaning. The note, the chattel mortgage, the trust receipt, and the bill of sale were made at the same time. We must view them all together. Clearly the respondent's only interest in the car was as security for the debt; this is the central fact, the coordinating element, that unifies the whole transaction. The bill of sale may seem to make the creditor a purchaser; whatever its recitals, it is a mortgage in another form. *Whittemore v. Fisher,* 132 Ill. 243, 24 N.E. 636. The trust receipt may state that the debtor holds the car as the property of the creditor; in truth, it is his own property, subject to a lien. *Barchard v. Kohn,* 157 Ill. 579, 585, 586, 41 N.E. 902, 29 L.R.A. 803. The substance of the transaction is this, and nothing more, that the mortgagor, a debtor, has bound himself by covenant not to sell the mortgaged chattel without the mortgagee's approval. The resulting obligation is not turned into one arising from a trust because the parties to one of the documents have chosen to speak of it as a trust. *Cf. In re Butts* (D.C.), 120 F. 966, 971; *Bloomingdale v. Dreher* (C.C.A.) 31 F.(2d) 93. The relation would be no different if the duty had been stated in terms of covenant alone without descriptive epithet. A mortgagor in possession before condition broken is not a trustee for the mortgagee within the meaning of this statute, though he has charged himself with a duty to keep the security intact. *Cf. Ten Eyck v. Craig,* 62 N.Y. 406, 422.

■■■ In *In re Frain,* 230 F.3d 1014 (7th Cir.2000), the United States Court of Appeals for the Seventh Circuit has somewhat broadened the concept of "fiduciary capacity" from that described by the Supreme Court in *Davis.* However, the critical factor is still that a "fiduciary relationship" pre-existed the purported wrong; all *Frain* does is to state that a fiduciary relationship can arise from other than an express trust, in that case due to the unique relationship among shareholders in a closely-held corporation and the disproportionate power wielded by one of those shareholders in relation to the other two. The circumstance in which a person obtains a loan from a bank and grants the bank a security interest in collateral to secure the loan indebtedness does not create a fiduciary relationship within the meaning of 11 U.S.C. § 523(a)(4).

■■■ We next come to the concepts of "embezzlement" and "larceny". The principal distinction between "embezzlement" and "larceny" is the manner in which the debtor came into possession of the property which is alleged to be the subject of the conduct giving rise to either of those wrongs. "Larceny" involves a concept in which the debtor has wrongfully acquired

property of which another person or entity is the owner; "embezzlement" is a concept in which the debtor is legally and consensually in possession of property owned by another which the debtor then diverts to purposes in contravention of another's ownership interest. In either case, the critical factor is a debtor's dealing with property *of which another person or entity is the owner.* As stated in *In re Tinkler,* 311 B.R. 869, 876–877 (Bankr.D.Colo.2004):

> Section 523(a)(4) provides that "[a] discharge under section 727 ... of this title does not discharge an individual debtor from any debt ... for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).

> BCI has specifically declined to take the position that the debt is non-dischargeable on account of fraud or defalcation while acting in a fiduciary capacity. Instead, it claims that Grand Lake's use of the sale proceeds from the rental machines for its own purposes, and its failure to immediately pay over those proceeds to BCI upon sale of those machines, constitutes embezzlement or larceny under § 523(a)(4).

> "Larceny is proven for § 523(a)(4) purposes if the debtor has wrongfully and with fraudulent intent taken property from its owner." *Kaye v. Rose (In re Rose),* 934 F.2d 901, 902 (7th Cir.1991). The key difference between embezzlement and larceny is that "[l]arceny requires that the funds originally come into the Debtor's hands unlawfully." *Webber v. Giarratano (In re Giarratano),* 299 B.R. 328, 338 (Bankr.D.Del. 2003). Certainly, whatever BCI's rights may be, the proceeds from the sale of the rental snowmobiles came into Grand Lake's hands lawfully. Therefore, Larceny is not at issue.

"For purposes of establishing nondischargeability under section 523(a)(4), embezzlement is defined under federal common law as 'the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.'" *Klemens v. Wallace (In re Wallace),* 840 F.2d 762, 765 (10th Cir.1988) (citations omitted). "This definition breaks down into five elements: 1. Entrustment (property lawfully obtained originally); 2. Of property; 3. Of another; 4. That is misappropriated (used or consumed for a purpose other than that for which it was entrusted); 5. With fraudulent intent." *Bryant v. Tilley (In re Tilley),* 286 B.R. 782, 789 (Bankr.D.Colo.2002). "Embezzlement, for purposes of 11 U.S.C. § 523 ... 'requires fraud in fact, involving moral turpitude or intentional wrong, rather than implied or constructive fraud.'" *In re Black,* 787 F.2d 503, 507 (10th Cir.1986) (quoting *American Family Insurance Group v. Gumieny (In re Gumieny),* 8 B.R. 602, 605 (Bankr.E.D.Wis.1981)).

By declining to take the position that its Agreement establishes an express or technical trust such that Mr. Tinkler may be held liable for fraud or defalcation in a fiduciary capacity, BCI tacitly acknowledges that the Agreement falls short of establishing such a trust relationship. Yet, curiously, BCI relies on the same Agreement, which admittedly fails to establish a trust relationship, to support its argument that the sale proceeds from the rental machines were the property of BCI, asserting that Grand Lake embezzled those sale proceeds by not turning them over.

One sentence in the Agreement states that Grand Lake is required to segregate "funds and proceeds payable to BCI ... IN TRUST for BCI separate and apart from dealer's funds." Even if

this Court could find, from that single sentence, that an express trust had been created, neither the Agreement itself nor the other documentation entered into evidence allows this Court to determine what funds and proceeds were payable to BCI and when they were payable. So, even if this Court believed that some sort of trust had been created, it would be at a complete loss to identify the res of the trust from the language of the Agreement.

Furthermore, in *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), the Supreme Court addressed the issue of whether an auto dealer's financing arrangements with the creditor, who provided funds for the acquisition of its inventory, created a trust relationship for nondischargeability purposes. In that transaction, in addition to the note and chattel mortgage, the dealer delivered to the creditor a bill of sale and a trust receipt. The bill of sale purported to convey absolute ownership of the automobile to the creditor, *Id.* at 334, 55 S.Ct. at 154, and the trust receipt purported to provide that the dealer was holding the car in trust for the creditor. *Id.* at 330, 55 S.Ct. at 152. Nonetheless, after examining all of the documents involved in the transaction, the Court found that the creditor's interest in the automobile sold "out of trust" to be a security interest only and the obligation of the dealer to its creditor to be in the nature of a *contractual* duty rather than that of a fiduciary. *Id.* at 334, 55 S.Ct. at 154.

The Court finds that BCI's interest in the proceeds from the sale of Grand Lake's rental machines was a security interest. Such an interest does not convert those proceeds to BCI's property such that it can maintain an action for nondischargeability under § 523(a)(4) on account of embezzlement. *First National Bank v. Phillips (In re Phillips)*, 882 F.2d 302, 304–305 (8th Cir.1989) (Finds that a security interest does not rise to the level of ownership sufficient to support a claim for embezzlement).

Simply stated, a lender who advances a loan for the purposes of its debtor's acquiring an interest in a motor vehicle and as part of that transaction acquires a security interest in the vehicle itself, does not have any ownership interest in the vehicle which will sustain either an action for larceny or an action for embezzlement. The same is true if the vehicle is sold and the debtor acquires the proceeds of that sale, impressed as they are with the security interest of the lender: as Article IX of the Uniform Commercial Code makes clear—and it is so clear that the Court will not spend time quoting the applicable sections—a security interest in secured collateral continues in identifiable proceeds, but the interest in those proceeds is still only a security interest and not an ownership interest. While it may be possible to structure a financing arrangement in terms which provide a lender with an ownership interest in property which is the subject of the financing transaction, that will be a rare circumstance indeed, and it is certainly not one which arises in the garden variety automobile loan entered into by banks with their customers.

The Court finds as a matter of law that the action asserted by Bank Calumet cannot be sustained under 11 U.S.C. § 523(a)(4).

### B. *11 U.S.C. § 523(a)(6)*

11 U.S.C. § 523(a)(6) in pertinent part states:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

The foregoing is seemingly such a simple concept, but following the decision of the United States Supreme Court in *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), what may have seemed at one time to be the relatively simple process of hooking a trout not worthy of Darwinian succession from the clear, cold waters of a mountain stream has now become a process akin to fishing in the murky depths just above the dam as the spring torrent delivers fish to that location with the sediment and fallen trees accumulated from higher elevations.

*Geiger* resolved a split between circuit courts of appeal—predominantly a split between the Eighth Circuit on the one hand and the Sixth and Tenth Circuits on the other hand—as to the concept of "willful" in 11 U.S.C. § 523(a)(6). As stated in *Geiger*:

> We confront this pivotal question concerning the scope of the "willful and malicious injury" exception: Does § 523(a)(6)'s compass cover acts, done intentionally, that cause injury (as the Kawaauhaus urge), or only acts done with the actual intent to cause injury (as the Eighth Circuit ruled)?

118 S.Ct. at 977. The Supreme Court sided with the Eighth Circuit, but the implications of its decision have engendered a tremendous diversity of opinion as to the construction to be given to § 523(a)(6) post-*Geiger*.

It is first absolutely necessary to establish the factual framework of the *Geiger* decision. In that case, Margaret Kawaauhau had sought treatment from the debtor, Dr. Paul Geiger, for a foot injury. Following his examination of her, Geiger admitted Kawaauhau to a hospital to deal with the risk of infection from her injury. The courts reviewing the circumstances found that Geiger knew that intravenous penicillin would have been more effective to treat Mrs. Kawaauhau's potential for infection, but that he instead proscribed oral penicillin on the basis that Mrs. Kawaauhau had expressed to him her desire to minimize the expense of her treatment, and that oral penicillin was in fact cheaper. Geiger then went off on a business trip and left Kawaauhau in the charge of other physicians; those physicians decided that she should be transferred to an infectious disease specialist. However, when Geiger returned, he cancelled the transfer and discontinued all antibiotics, apparently because he believed the infection had subsided and there was no further need for antibiotic treatment. In very short order, Mrs. Kawaauhau's condition deteriorated to the point that it was necessary to amputate her right leg below the knee within the next several days as a result of advancing infection. Kawaauhau and her husband obtained a jury verdict for malpractice against Geiger, and as will happen in these circumstances, Geiger—who had no malpractice insurance-filed a bankruptcy case to deal with the resulting liability to the Kawaauhaus. The Kawaauhaus, as many times happens in these circumstances, filed an adversary proceeding to seek to determine that Geiger's debt to them arising from his jury-established malpractice was excepted from discharge pursuant to 11 U.S.C. § 523(a)(6).

There are no facts presented in *Geiger* that indicate in any way that the debtor intended to cause harm to Mrs. Kawaauhau. The theory of the Kawaauhaus' case was that Geiger's acts of malpractice were intentionally undertaken by him, and that thus despite the fact that he did not intend injury to them, because injury had resulted from his at least "grossly negligent"

intended acts, his actions were "willful" under § 523(a)(6) and thus the jury verdict was excepted from discharge. As stated above, the case as presented to the Supreme Court was premised upon conflicting decisions of courts of appeal as to whether intentional conduct of the debtor that resulted in injury is within the scope of § 523(a)(6), as contrasted to "acts done with the actual intent to cause injury".

As will be mentioned briefly later in this decision, some post-*Geiger* decisions have viewed the case as collapsing the concepts of "willful" and "malicious" into one composite standard. In this Court's view, that is erroneous. In the very sentence in which a *unanimous* Supreme Court decision defines the issue before it, the Court inserted a footnote (footnote 3) which clearly delineates that the focus of the decision is solely on the term "willful" in § 523(a)(6). Footnote 3 states:

> FN3. The word "willful" is defined in Black's Law Dictionary as "voluntary" or "intentional." Black's Law Dictionary 1434 (5th ed.1979). Consistently, legislative reports note that the word "willful" in § 523(a)(6) means "deliberate or intentional." See S.Rep. No. 95–989, p. 79 (1978) U.S.Code Cong. & Admin.News pp. 5787, 5864; H.R.Rep. No. 95–595, p. 365 (1977) U.S.Code Cong. & Admin.News pp. 5963, 6320.

Immediately following the paragraph in which the foregoing footnote appears, the Supreme Court applied its definition of "willful" as stated in footnote 3 to the statute, stating:

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have ·selected an additional word or words, *i.e.,* "reckless" or "negligent," to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences* of an act," not simply "the act itself." Restatement (Second) of Torts § 8A, Comment *a,* p. 15 (1964) (emphasis added).

The next two paragraphs of the opinion—much-quoted in post-*Geiger* decisions which have sought to construe the scope of the Supreme Court's determination—offer little further analysis, except to the extent that those two paragraphs make absolutely clear the fact that only the term "willful" is being addressed by the decision and state the underlying rationale for the determination that "willful" modifies the word "injury" and does not merely describe the nature of the action of the debtor from which an alleged injury occurred.

Thus far then, *Geiger* clearly teaches that in order to fall within 11 U.S.C. § 523(a)(6), an alleged action by the debtor must have been "willful"—i.e., must have been "voluntary", and "deliberate or intentional"—*and must have been directed to causing the "injury" which is the focus of the § 523(a)(6) action.* There is no hint in the decision that the term "malicious" was ever considered as part of the "willful" standard, or that the Court was in any manner addressing the concept of "malicious" under § 523(a)(6). In fact, to have done so would have violated the very statutory construction considerations that the Supreme Court relied upon to in part formulate its determination of the definition of "willful", as is made clear by the following:

Furthermore, "we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *Mackey v. Lanier Collection Agency & Service, Inc.,* 486 U.S. 825, 837, 108 S.Ct. 2182, 2189, 100 L.Ed.2d 836 (1988). Reading § 523(a)(6) as the Kawaauhaus urge would obviate the need for § 523(a)(9), which specifically exempts debts "for death or personal injury caused by the debtor's operation of a motor vehicle if such operation was unlawful because the debtor was intoxicated from using alcohol, a drug, or another substance." 11 U.S.C. § 523(a)(9); see also § 523(a)(12) (exempting debts for "malicious or reckless failure" to fulfill certain commitments owed to a federal depository institutions regulatory agency).

118 S.Ct. at 977.

It is from the point of conclusion of the foregoing quotation to the end of the *Geiger* decision that has caused a great deal of consternation among courts which have been called upon to construe the specific parameters of *Geiger.* The Supreme Court addressed three decisions which had previously been made by it under the predecessor statutes of § 523(a)(6): *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904); *McIntyre v. Kavanaugh,* 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed. 205 (1916); and *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). It is instructive to note that the Court went to great pains to discuss *Tinker* and to limit *Tinker's* holding to essentially the facts of that case, stating the following:

The Kawaauhaus heavily rely on *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), which presented this question: Does an award of damages for "criminal conversation" survive bankruptcy under the 1898 Bankruptcy Act's exception from discharge for judgments in civil actions for " 'willful and malicious injuries to the person or property of another' "? *Id.,* at 481, 24 S.Ct., at 506. The *Tinker* Court held such an award a nondischargeable debt. The Kawaauhaus feature certain statements in the *Tinker* opinion, in particular: "[An] act is willful ... in the sense that it is intentional and voluntary" even if performed "without any particular malice," *id.,* at 485, 24 S.Ct., at 508; an act that "necessarily causes injury and is done intentionally, may be said to be done willfully and maliciously, so as to come within the [bankruptcy discharge] exception," *id.,* at 487, 24 S.Ct., at 509. See also *id.,* at 487, 24 S.Ct., at 509 (the statute exempts from discharge liability for " 'a wrongful act, done intentionally, without just cause or excuse' ") (quoting from definition of malice in *Bromage v. Prosser,* 4 Barn. & Cress. 247, 107 Eng. Rep. 1051 (K.B.1825)).

The exposition in the *Tinker* opinion is less than crystalline. Counterbalancing the portions the Kawaauhaus emphasize, the *Tinker* Court repeatedly observed that the tort in question qualified in the common law as trespassory. Indeed, it ranked as "trespass *vi et armis.*" 193 U.S., at 482, 483, 24 S.Ct., at 507. Criminal conversation, the Court noted, was an action akin to a master's "action of trespass and assault ... for the battery of his servant," *id.,* at 482, 24 S.Ct., at 507. *Tinker thus placed criminal conversation solidly within the traditional intentional tort category, and we so confine its holding.* That decision, we clarify, provides no warrant for departure from the current statutory instruction that, to be nondischargeable, the judgment debt must be "for willful and malicious *injury.*" (emphasis supplied)

118 S.Ct. at 977–978. It is thus clear that the *Geiger* Court did not endorse the broad language of *Tinker,* which in and of itself tended to mesh the concept of "willful" into the concept of "malicious". *Geiger* clearly limits *Tinker* to a decision on the facts before the Court in that case, and confirms only that because the elements of "criminal conversation" *ipso facto* involve an intent to commit an injury, the type of conduct encompassed within the concept of "criminal conversation" is the type of "willful act" which falls within the provisions of § 523(a)(6).

Now we begin to angle in the depths of the murky pool above the dam. The next paragraph of *Geiger* specifically endorses *McIntyre* and *Davis* as being "in accord with our construction" of § 523(a)(6), stating as follows:

> Subsequent decisions of this Court are in accord with our construction. In *McIntyre v. Kavanaugh,* 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed. 205 (1916), a broker "deprive[d] another of his property forever by deliberately disposing of it without semblance of authority." *Id.,* at 141, 37 S.Ct., at 39. The Court held that this act constituted an intentional injury to property of another, bringing it within the discharge exception. But in *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), the Court explained that not every tort judgment for conversion is exempt from discharge. Negligent or reckless acts, the Court held, do not suffice to establish that a resulting injury is "wilful and malicious." See *id.,* at 332, 55 S.Ct., at 153.

The murkiness of the pool can only be appreciated by review of the descriptions of the fish sought to be hooked by the creditors in *McIntyre* and *Davis* with their section 523(a)(6) casts. *McIntyre* is first. Decided as it was in 1916, it is instructive to note that the language of the "willful and malicious injury" exception to discharge of debts in bankruptcy has remained unchanged since the Bankruptcy Act was originally enacted:

> As originally enacted, § 17 of the Bankruptcy Act provided:
>
> 'A discharge in bankruptcy shall release a bankrupt from all of his provable debts, except such as ... (2) are judgments in actions for frauds, or obtaining property by false pretenses or false representations, or for wilful and malicious injuries to the person or property of another; ... (4) were created by his fraud, embezzlement, misappropriation, or defalcation while acting as an officer or in any fiduciary capacity.' [30 Stat. at L. 550, chap. 541, Comp. Stat. 1913, § 9601.]
>
> This was amended by Act February 5, 1903, so as to read:
>
> 'A discharge in bankruptcy shall release a bankrupt from all of his provable debts, except such as ... (2) are liabilities for obtaining property by false pretenses or false representations, or for wilful and malicious injuries to the person or property of another, or for alimony due or to become due, or for maintenance or support of wife or child, or for seduction of an unmarried female, or for criminal conversation; ... or (4) were created by his fraud, embezzlement, misappropriation, or defalcation while acting as an officer or in any fiduciary capacity.' [32 Stat. at L. 798, chap. 487, Comp. Stat. 1913, § 9601.]

37 S.Ct. at 39. The factual circumstances of *McIntyre* disclose an almost Dickensian plot of intentionally and fraudulently disposing of property held for another without any valid basis or excuse, leading to the financial ruin of an innocent victim—life mimicking fiction, or fiction mimicking life. Careful review of *McIntyre* will dis-

close to the gentle reader that the issue actually addressed was whether or not the tort of "conversion" could possibly, as a matter of law, be within the scope of § 523(a)(6)—to which the Supreme Court responded "you bet it can".

At this point we know that *Geiger* endorses *McIntyre* as being in consonance with *Geiger*. However, the underpinning for *McIntyre* was an extensive reliance on *Tinker, supra,* which the Supreme Court had essentially disavowed in *Geiger* as a guiding light for § 523(a)(6) determinations. As a result, this Court divines from the foregoing that the expansive language of *Tinker* adopted by *McIntyre* has been disavowed, but that the direct holding of *McIntyre*—that the tort of conversion can be within the parameters of § 523(a)(6)— remains viable.

We next turn to *Davis v. Aetna Acceptance Co., supra. Davis* involved what is essentially now known as a "floor financing" arrangement between a lender and a retail automobile dealer. It must be borne in mind that at the time that both *McIntyre* and *Davis* were decided, there was no 11 U.S.C. § 523(c): the discharge of an indebtedness by operation of the filing of bankruptcy was an affirmative defense to be asserted in response to an action on the indebtedness itself, and these two decisions arose from state court determinations on the affirmative defenses of "discharge in bankruptcy" asserted by the debtors against the respective creditors in each of those state court proceedings. Thus, in part, *Davis* reviewed the findings of fact and conclusions of law of a state court which specifically found that Davis "was not actuated by willful, malicious or criminal intent in disposing of the car in question" [55 S.Ct. at 153], despite finding

that Davis had in fact committed conversion of the creditor's security interests in a motor vehicle which served as collateral for Davis' obligation to the creditor on essentially a "floor planning" arrangement.[2] For the purposes of *Geiger's* reliance upon *Davis,* the most that can be said is that the tort of "conversion" may give rise to an exception to discharge under § 523(a)(6), but that the acts of the debtor with respect to the conversion must demonstrate "willfulness and malice", i.e., the two concepts are separate, and "willful" means that the debtor actually intends, *at the time of the conversion,* to injure the creditor by depriving it of property rights which it has in its collateral. As stated in Justice Cardozo's decision for a unanimous Court:

> The respondent contends that the petitioner was liable for a willful and malicious injury to the property of another as the result of the sale and conversion of the car in his possession. There is no doubt that an act of conversion, if willful and malicious, is an injury to property within the scope of this exception. Such a case was *McIntyre v. Kavanaugh,* 242 U.S. 138, 37 S.Ct. 38, 61 L.Ed. 205, where the wrong was unexcused and wanton. But a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without willfulness or malice. *Boyce v. Brockway,* 31 N.Y. 490, 493; *Laverty v. Snethen,* 68 N.Y. 522, 527, 23 Am.Rep. 184; *Wood v. Fisk,* 215 N.Y. 233, 239, 109 N.E. 177; *Stanley v. Gaylord,* 55 Mass. 536, 1 Cush.(Mass.) 536, 550, 48 Am.Dec. 643; *Campau v. Bemis,*

---

**2.** Interestingly, the last portion of *Davis* explains why an ordinary financing arrangement regarding motor vehicles in which a

creditor retains a security interest is not subject to § 523(a)(4).

35 Ill.App. 37; *In re De Lauro* (D.C.), 1 F.Supp. 678, 679. There may be an honest but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not a willful and malicious one.

■ Putting the foregoing together, the Court determines that in order to sustain an action under 11 U.S.C. § 523(a)(6), a creditor must demonstrate the following:

1. That the debtor's actions caused an "injury" to the person or property interest of the creditor.

2. That the debtor's actions which caused the injury were the result of "willful" conduct by the debtor by which the debtor intended to effect an injury to the person or property interest of the creditor.

3. That the debtor's "willful" acts were undertaken in a "malicious" manner.

■ Viewed as outlined above, the *Geiger* standard is extremely strict for creditors to meet. That is as it should be. Exceptions to discharge are supposed to hook "bad actors", not those who merely act poorly. When we troll the murky depths of dischargeability from our place on the shore immediately above the dam, our goal is to snare the lampreys in the stream, not the carp and the catfish. Moreover, in the context of 11 U.S.C. § 523(a)(6), as is true with any exception to discharge, the creditor must prove each element of the dischargeability action by a preponderance of the evidence-*Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991); *In re Bero*, 110 F.3d 462, 465 (7th Cir.1997), and "exceptions to discharge are to be construed strictly against a creditor and in favor of the debtor." *In re Scarlata*, 979 F.2d 521, 524 (7th Cir.1992), reh. en banc den.1993;

*In re Zarzynski*, 771 F.2d 304, 306 (7th Cir.1985).

■ Just as is true in § 523(a)(2)(A) cases with respect to the use of a credit card or the presentment of a check[3], under 11 U.S.C. § 523(a)(6) the mere failure to abide by contractual obligations is *not* sufficient to sustain an exception to discharge. The lesson to be learned from *Tinker* (disrespected though it has been), *McIntyre* and *Davis*—as applied by *Geiger*—is that people make mistakes and people breach contracts, but that it is only when they do so with an intent to harm the person or property interest of the party with whom they contracted that they will be denied the redemption from their mistakes intended by Congress through the enactment and implementation of the bankruptcy laws of the United States. It is not supposed to be a simple matter to prove that a debtor who failed to pay a check when presented, failed to pay a credit card bill, or failed to remit the proceeds of property sold subject to a security interest—should have the "debt" arising from that conduct be excepted from discharge. Exceptions to discharge are supposed to be just that:: *exceptions*, and not the rule.

The analysis of the legal standards to be applied to an action under 11 U.S.C. § 523(a)(6) has indeed been one of the most significantly convoluted and difficult exercises the judge writing this decision has yet performed. There are *tremendous* disagreements on a number of substantive issues of interpretation under § 523(a)(6) among courts which have reviewed that statute in light of *Geiger*. There is *no* guiding Seventh Circuit precedent on these issues, and no post-*Geiger* pronouncements by the United States Supreme Court with respect to this statute.

---

**3.** *See, In re Hostetter*, 320 B.R. 674 (Bankr. N.D.Ind.2005).

Because of the plethora of actions brought in this Court under § 523(a)(6), the Court has been very careful to seek to divine the intent of the United States Supreme Court in a manner which consistently deals with all of the fish in the stream of bankruptcy cases, whether the circumstances of seeking to hook those fish arise in the clear waters of a mountain stream or the murky pool created by spring freshets at the rim of the dam.

With the foregoing in mind, let's look briefly at several of the disputes that have arisen among courts post-*Geiger*.

■ First, there is a school[4] of thought that by the manner in which it addressed the issues in *Geiger*, the Supreme Court created a "unified" standard for the concepts of "willful and malicious". As stated in *In re Endicott*, 254 B.R. 471, 478 (Bankr.D.Idaho 2000):

> Until the issue identified but left open in *Molina* is resolved, I conclude that a § 523(a)(6) plaintiff must meet the standard of *Baldwin* as above set forth. *The Ninth Circuit's post-Geiger case law does not expressly require a separate inquiry into, or proof of, malice.* (emphasis supplied).

Cases such as the foregoing posit that post-*Geiger*, there is no separately existing element under § 523(a)(6) with respect to "malicious" conduct. As outlined above, the Supreme Court made clear in *Geiger* that it was only addressing the concept of "willful injury", and there is nothing in *Geiger* that addresses the separate element of "malicious" which the *Geiger* decision makes clear in its analysis must be deemed to be a separate component of the § 523(a)(6) test. Here is an example. If you have ever dealt with a person who is completely hysterical and who as a result is intent upon, and fully capable of, inflicting injury upon himself/herself or another person as a result of this hysteria, you may have tried the technique that you've seen in any number of motion pictures: If it's a man, hit him hard in the face; if it's a woman, slap her hard in the face. By doing so, you would have intended to strike a person and to inflict pain on them. However, you would not have been "malicious" in doing so, because you were guided by an honest belief that the only way to get that person under control was to shock him/her by a certain form of physical injury. If you broke a jaw in the process, and you were able to prove that your goal was to bring that person under control, it could not be found that the personal injury you inflicted is within the scope of § 523(a)(6), because you simply did not act with "malice" as that term is defined. There are any number of other "cruel to be kind" circumstances in human life in which the actor intends an injury, but the goal of the injury is to save the person upon whom the injury is visited, or others, from harm. If as a police officer, I shoot to disable, or even to kill, a person spraying a crowded mall with fire from an AK–47 but/and he dies from my shot, and I then am forced to file a bankruptcy case to deal with the 42 U.S.C. § 1983 and tort actions brought by his family, the collapsing of the "willful" and "malicious" elements into one test for dischargeability dooms me. It is in these contexts, and many others in the course of human experience, that the term "malicious" maintains its viability. The Court therefore views the cases which have decided that *Geiger* collapses "willful and malicious" into one concept to have misinterpreted the requirements of § 523(a)(6) as established by *Geiger*.

■ The next diversion in post-*Geiger* case law is whether the "willful" standard

---

4. No pun on fish of course intended.

enunciated by *Geiger* is a totally "subjective" standard which relates solely to the internal workings of the debtor's mind, or whether there are elements of "objective" evaluation which may be weighed in the "willful" standard. A corollary of this divergence in opinion is whether the Supreme Court's reference to "intentional torts" in *Geiger* somehow plays into the analysis: this debate arises essentially from the statement in *Geiger* that § 523(a)(6) "triggers in the lawyer's mind the category 'intentional torts', as distinguished from negligent or reckless torts", 118 S.Ct. at 977—followed by a reference to *Restatement Second of Torts*, § 8A, Comment *a*, p. 15 (1964). Reviewing the *Restatement Second's* discussion of the concept of intentional tort, some courts have developed a standard that the "willful" element may be established by either proof that there was an "objective substantial certainty of harm", or a subjective motive to do harm. This analysis is perhaps best exemplified by the decision of the United State Court of Appeals for the Fifth Circuit in *Miller v. J.D. Abrams, Inc.*, 156 F.3d 598, 603–604 (5th Cir.1998):

> The Supreme Court recently answered the "pivotal question" of whether § 523(a)(6) covers "acts, done intentionally, that cause injury ... or only acts done with the actual intent to cause injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998). The Court's conclusion was that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Id.* This conclusion was similar to one that the Fifth Circuit had reached in analyzing § 523(a)(6). In *Corley v. Delaney (In re Delaney)*, 97 F.3d 800 (5th Cir.1996) this court reaffirmed its earlier holding that "for will-

fulness and malice to prevent discharge under § 523(a)(6), the debtor must have intended the actual injury that resulted" and not just performed an intentional act that resulted in injury. *Id.* at 802.

Before we can determine whether the findings of the jury in the state court conclusively determine whether Miller inflicted a "willful ... injury," we must grasp the Supreme Court's insistence on "actual intent to cause injury." The Supreme Court's disposition in *Kawaauhau* certainly eliminates the possibility that "willful" encompasses negligence or recklessness. *See Kawaauhau*, 523 U.S. at 64, 118 S.Ct. at 978 ("We hold that debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6).").

At least three remaining readings are possible. The standard might be met by any tort generally classified as an intentional tort, by any tort substantially certain to result in injury, or any tort motivated by a desire to inflict injury. We hold that the label "intentional tort" is too elusive to sort intentional acts that lead to injury from acts intended to cause injury. Rather, either objective substantial certainty or subjective motive meets the Supreme Court's definition of "willful ... injury" in § 523(a)(6).

If "actual intent to cause injury" and intentional torts were parallel terms, issue preclusion with respect to willfulness would apply in favor of Abrams. This is because misappropriation of proprietary information and misuse of trade secrets are generally considered to be intentional torts. *See, e.g., Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 653–54 (7th Cir.1998) (Posner, C.J.) ("The misappropriation of a trade secret is an intentional tort."); *Restatement (Third) Unfair Competition* § 40(b) (defining the scienter requirement for mis-

use of trade secrets); *see also Hyde Corp. v. Huffines,* 158 Tex. 566, 314 S.W.2d 763, 769 (1958) (relying on a similar predecessor Restatement definition in defining misuse of trade secrets); *American Derringer Corp. v. Bond,* 924 S.W.2d 773, 777 (Tex.App.Waco 1996, no writ) (following *Hyde*).

The category of intentional torts, however, is broader. The Supreme Court did specifically refer to intentional torts, noting that "the (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts." *Kawaauhau,* 523 U.S. at 61, 118 S.Ct. at 977. This acknowledgment of a logical association, however, avoids equating § 523(a)(6) torts and intentional torts, and with good reason.

Merely because a tort is classified as intentional does not mean that any injury caused by the tortfeasor is willful. This case illustrates the distinction, since misappropriation of proprietary information and misuse of trade secrets are wrongful regardless of whether injury is substantially certain to occur. *See, e.g., Restatement (Third) Unfair Competition* § 40(b) cmt. c ("[A]ny exploitation of the trade secret that is likely to result in injury to the trade secret owner *or* enrichment to the defendant is a 'use' under this section."). Misuse of trade secrets is not precisely like stealing funds from a till, because the tortfeasor's gain is not inevitably a loss to the legal owner of the secret.

Most often, an intentional tort requires either objective substantial certainty of harm or subjective motive to do harm. Indeed, the presence of one of these factors is both necessary and sufficient for a tort to be classified as an "intentional tort" under the traditional modern definition. *See* Kenneth J. Vandevelde, *A History of Prima Facie Tort: The Origins of a General Theory of Intentional Tort,* 19 Hofstra L.Rev. 447, 447 (1990) (describing "intentional torts" as those where "the defendant acted with the intent to injure the plaintiff or with substantial certainty that his action would injure the plaintiff").

Thus, rather than allow the general classification of a tort to be a talisman, we hearken back to this original definition of "intentional tort" to determine whether injury is "willful" for § 523(a)(6) purposes. This test is fully consistent with our precedent. *Delaney,* which remains good law because the Supreme Court in no way contradicted it, equated intending actual injury to a situation in which "the debtor intentionally took action that necessarily caused, or was substantially certain to cause, the injury." *Delaney,* 97 F.3d at 802. Although *Delaney* did not address whether a subjective motive to injure would alternatively be sufficient to trigger § 523(a)(6), it would seem peculiar to deem an action causing injury not "willful" when the tortfeasor's action was in fact motivated by a desire to cause injury.

Applying this test, we find that willful injury was not decided in the state court suit. If the subjective standard alone were the standard, issue preclusion would give Miller victory because the jury found that he did not act with "malice," defined by the court to include "evil motive." Miller's conduct, however, could still be "willful" under the objective standard, if his acts were substantially certain to result in injury to Abrams. The state court jury determined only that injury was proximately caused by Miller's acts, a less demanding standard than "substantial certainty."

*See also, In re Smithey,* 2005 Bankr.LEXIS 484 (Bankr.N.D.Ga.2005); *In re Wood,*

309 B.R. 745 (Bankr.W.D.Tenn.2004) [based upon Tenth Circuit law stated in *Panalis v. Moore*, 357 F.3d 1125 (10th Cir.2004)].

Contrary to the analysis in *Miller*, in this Court's view the Supreme Court's reference to the Second Restatement of Torts in *Geiger* was not intended to create the divergence between "subjective intent" and "objective intent" evidenced in post-*Geiger* cases. "Objective intent" comes perilously close to analyzing the "willful" element of § 523(a)(6) in terms of whether the debtor "should have known" that his/her conduct would lead to injury, the standard disavowed by *Geiger*: the fact that a physician in the ordinary exercise of his professional standards of care should have realized that his prescribed course of treatment would lead to injury did not meet the "willful" element of the statute. There is nothing "objective" about the *Geiger* standard: the "willful" element all depends upon the defendant's/debtor's state of mind.[5]

■ The Court agrees with the analysis of the United States Court of Appeals for the Sixth Circuit in *In re Markowitz*, 190 F.3d 455, 464 (6th Cir.1999):

The Court's citation to the Restatement's definition of "intentional torts" underscores the close relationship between the Restatement's definition of those torts and the definition of "willful and malicious injury." The Restatement defines intentional torts as those motivated by a desire to inflict injury or those substantially certain to result in injury. Although the Supreme Court identified a logical association between intentional torts and the requirements of § 523(a)(6), it neither expressly adopted nor quoted that portion of the Restatement discussing "substantially certain" consequences. Nonetheless, from the Court's language and analysis in *Geiger*, we now hold *that unless "the actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it," Restatement (Second) of Torts § 8A, at 15 (1964),* he has not committed a "willful and malicious injury" as defined under § 523(a)(6). (emphasis supplied)

As the emphasized portion of the above-quoted section establishes, reference to the Restatement Second of Torts does not negate a totally "subjective" standard: in order to constitute "willful" conduct, a debtor must either "desire the consequences of his act" [target harm to another entity's person or property], or himself/herself *believe* that harm is substantially certain to result from his/her actions. After *Geiger*, there is no room for the "objective" inquiry into the probabilities of harm, because to do so renders the "willful" element of § 523(a)(6) tantamount to the mere intention to act without intending the consequences of the act in relation to the injury. *Geiger* requires "you *knew* that would hurt", not "any idiot would/should have known that would hurt".

■ Given that "willful" and "malicious" are separate elements of 11 U.S.C. § 523(a)(6), what then is the meaning of

**5.** The Court recognizes that establishing a state of mind in a record on a default judgment or for the purposes of summary judgment is extraordinarily difficult. Unlike some other courts that have been result-oriented post-*Geiger*, this Court is not so. As is true with the Court's position with respect to § 523(a)(2)(A), whether or not a creditor can easily establish a *prima facie* case on a default or summary judgment record is *not* a consideration in applying the law as it has been directed by Congress and by appellate courts; *See, In re Hostetter, supra,* at 683–687. Even in a default context, a number of discovery devices—including requests for admission, depositions, requests for production of documents and interrogatories—are available to a creditor seeking to sustain its burden of proof.

344

the word "malicious"? In the Court's view, pre-*Geiger* precedent is controlling on this issue, and does not lose its vitality as a result of *Geiger*. The United States Court of Appeals for the Seventh Circuit has defined "malicious" in *In Thirtyacre*, 36 F.3d 697, 700 (7th Cir.1994), as follows:

> Under § 523(a)(6), of the Bankruptcy Code, willful means deliberate or intentional ... [and] [m]alicious means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm. *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir.1986).

Admittedly, the separation of the concepts of "willful" and "malicious" is at times an extraordinarily difficult task, but not so much so when it is realized that § 523(a)(6) is intended to control for all of the myriad circumstances of human conduct which give rise to harm to another. As postulated above, it is entirely possible to intend to harm someone for their own benefit, thus satisfying the "willful" standard but failing on the "malicious" test. It is also entirely possible to intentionally commit an act in dereliction of one's duties or without just cause or excuse which isn't directed to cause harm to anyone.[6]

Perhaps the greatest conceptual problem *Geiger* creates is in the context of cases involving conversion. As stated in *In re Gagle*, 230 B.R. 174, 181 (Bankr. D.Utah.1999):

Since the Supreme Court's ruling in *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), it has been clear that if a debtor commits the tort of conversion, it may, under certain circumstances, constitute a willful and malicious injury. *Posta*, 866 F.2d at 367 (willful and malicious injury includes the conversion of property subject to a creditor's security interest). Conversion of property consists of "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." RESTATEMENT (SECOND) OF TORTS (1965) § 222A; *Bank of Utah v. Auto Outlet, Inc. (In re Auto Outlet, Inc.)*, 71 B.R. 674, 676 (Bankr.D.Utah 1987) ("Conversion is generally defined as a wrongfully assumed 'dominion over personal property by one person to the exclusion of possession by the owner and in repudiation of the owner's rights.'" (citations omitted)). "But a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without wilfulness or malice." *Davis*, 293 U.S. at 330, 55 S.Ct. 151, 79 L.Ed. 393.

As further stated in *In re Endicott*, 254 B.R. 471, 478 (Bankr.D.Idaho 2000):

**6.** This concept will come into play in view of the BAPCPA amendment to 11 U.S.C. § 1328(a)(4), which precludes discharge in a Chapter 13 case of "restitution, or damages, awarded in a civil action against the debtor as a result of willful *or* malicious injury by the debtor that cause personal injury to an individual or the death of an individual". (emphasis supplied) As outlined above, the concepts of "willful" and "malicious" are clearly separate under *Geiger*, and only one of those elements needs to be satisfied to except a Chap-

ter 13 debtor's debt from discharge under the parameters of § 1328(a)(4). An example? In a fit of road rage at being driven off the road by an idiot driver, I race after him in hot pursuit, but I miss a curve and plow into a house on the curve, killing a grandfather who is watching television as my car crashes into his living room. As Forrest Gump said his Mama said, " 'it' happens". In this example, "it" is dischargeable in a Chapter 7 case, but not so in a post-BAPCPA Chapter 13 case.

The question of conversion of collateral under § 523(a)(6) arises with some regularity. Such cases present a unique conceptual difficulty. As stated in *Avco Financial Services of Billings v. Kidd (In re Kidd),* 219 B.R. 278 (Bankr. D.Mont.1998):

> The problem with conversion cases ... is that rarely are the debtors acting out of a desire to injure the creditors, even though the injury to the creditor, although not desired, is almost always substantially certain to result from a debtor's actions. Thus, the key in conversion cases is to analyze each set of circumstances on a case-by-case basis to determine whether the conversion is in the nature of an intentional tort or whether the conversion is a result of a negligent or reckless tort—but not willful or malicious.

219 B.R. at 284. That court therefore concluded, consistent with *Geiger's* focus and reasoning:

> [A] creditor, in order to prevail under § 523(a)(6), must demonstrate by a preponderance of the evidence, that the debtor desired to cause the injury complained of, or that the debtor believed that the consequences were substantially certain to result from the debtor's acts. In other words, in the case of a conversion, a creditor must show that a debtor, when converting collateral, did so with the specific intent of depriving the creditor of its collateral or did so knowing, with substantial certainty, that the creditor would be harmed by the conversion. This subjective test focuses on whether the injury was in fact anticipated by the debtor and thus insulates the innocent collateral conversions from non-dischargeability under § 523(a)(6).

The Court has embarked upon its own literacy campaign, seeking to read most of the post-*Geiger* cases which in any way analyze the § 523(a)(6) standards, and especially those which relate to the tort of "conversion" within the parameters of those standards. When one does this, one is left with the distinct impression that most courts in the § 523(a)(6) arena (bankruptcy courts as trial courts, and District Courts and Courts of Appeals as appellate courts) have a great deal of difficulty with conversion cases, especially those in which the proceeds of the converted collateral were used by the debtor for entirely humanistic reasons, e.g., feeding the family or paying other debts so that the family could survive. It is obvious that most courts seek to tailor their interpretations of *Geiger* based upon their own subjective views of what should and should not be allowed as a nondischargeable debt with respect to conversion, and not necessarily upon what an analytical reading of *Geiger* requires. To experience a few of these decisions, one might want to read the following: *Haemonetics Corp. v. Dupre,* 238 B.R. 224 (D.Mass.1999); *In re Crump,* 247 B.R. 1 (Bankr.W.D.Ky.2000); *In re Tomlinson,* 220 B.R. 134 (Bankr.M.D.Fla.1998); *In re Persinger,* 1998 WL 542326, 1998 Bankr.LEXIS 1050 (Bankr.N.D.Ohio 1998); and *In re Granati,* 270 B.R. 575 (Bankr.E.D.Va.2001). However, federal bankruptcy courts are not supposed to make the law themselves; rather, they are to apply the law as it has been established by courts of higher authority. With respect to § 523(a)(6), the meaning of "willful" has been definitively defined by the United States Supreme Court; the meaning of "malicious" has been defined by the United States Court of Appeals for the Seventh Circuit.

In the context of the evidence necessary to sustain an action under 11 U.S.C.

§ 523(a)(6) in light of the *Geiger* standard of "willful", the Court finds the following to be instructive, as stated in *In re Longley,* 235 B.R. 651, 657 (10th Cir. BAP 1999):

In light of *Geiger,* the standard for willful under § 523(a)(6) appears to be the same for conversion as for any other injury; to be willful, the debtor must intend that conversion of the collateral injure the creditor or the creditor's lien interest. However, *Geiger* does not address the evidence by which intent to injure can be established. We believe that as to proof of intent to injure in the context of conversion of secured property, *Posta* and *Pasek* remain instructive. Intent may be established by either direct or indirect evidence. *Posta,* 866 F.2d at 367. Willful injury may be established by direct evidence of specific intent to harm a creditor or the creditor's property. *Id.* Willful injury may also be established indirectly by evidence of both the debtor's knowledge of the creditor's lien rights and the debtor's knowledge that the conduct will cause particularized injury. *Pasek,* 983 F.2d at 1527. *See also* RESTATEMENT (SECOND) OF TORTS § 8A (1965) ("The word 'intent' is used throughout the Restatement of this Subject to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.").

In the case at bar, the Bankruptcy Court correctly found that Longley intentionally transferred the vehicle to Doe. However, consistent with the teaching of *Geiger,* Longley's intentional act is insufficient to satisfy the willfulness element of § 523(a)(6). For Longley's obligation to be non-dischargeable, Mitsubishi was required to present evidence that Longley intended to injure it or its lien interest. We find the stipulated facts were inadequate in this regard. The Bankruptcy Court's findings that Longley transferred the vehicle "in total disregard of the lien interest of Mitsubishi" and that he was "fully aware that Mitsubishi had a valid security interest in the car and neither had consented or would consent to the transfer" were unsupported by the factual stipulation and therefore constitute clear error. Neither Mitsubishi's Security Agreement nor the terms thereof were presented to the Bankruptcy Court. Although Longley admitted in the factual stipulation that Mitsubishi held a lien interest in the car, nothing in the factual stipulation established that Longley was aware of or considered of the lien or its terms at the time he transferred the vehicle to Doe. In the absence of evidence of the terms of the Security Agreement and Longley's appreciation of such terms, one cannot conclude that Longley was required to obtain Mitsubishi's permission prior to transferring possession of the vehicle or that Longley's failure to disclose the transfer followed by payment constituted concealment.

Finally, although this Court does not adopt any implication in the decision that any form of "objective" standard of intent or knowledge can satisfy the requirements of *Geiger* regarding the element of "willful" in § 523(a)(6), the Court deems the following to be an appropriate analytical framework within which to address § 523(a)(6) actions, particularly those which involve "conversion":

The Supreme Court recently examined § 523(a)(6) in *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). There the creditor argued that the debtor had "intentionally rendered inadequate medical care ... that necessarily led to her injury." *Geiger,* 523

U.S. at 61, 118 S.Ct. at 976. As framed by the Supreme Court, the issue presented was: "Does 523(a)(6)'s compass cover acts, done intentionally, that cause injury ... or only acts done with the actual intent to cause injury ...?" *Id.* The Court examined the language of the statute, first noting that the word willful is defined as "voluntary" or "intentional," *Geiger*, 523 U.S. at 61 n. 3, 118 S.Ct. at 977 n. 3, and then concluded that "the word 'willful' ... modifies the word 'injury,' indicating that *nondischargeability takes a deliberate or intentional injury,* not merely a deliberate or intentional act that leads to an injury." *Geiger*, 523 U.S. at 61, 118 S.Ct. at 977 (emphasis added). It then explained that "the (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts" and "[i]ntentional torts generally require that the actor intend 'the consequences of an act,' not simply, 'the act itself'." *Geiger*, 523 U.S. 57, 61–62, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (quoting *Restatement (Second) of Torts* § 8A, Comment a, p. 15 (1964)).

*Geiger* seems to have created almost as much consternation as it set out to resolve. In part, this is because the Court never said what "willful" is; only what it is not—it is not negligence, recklessness or a breach of contract. *Geiger*, 523 U.S. at 61–62, 118 S.Ct. at 977. Although the Court observed that the language of § 523(a)(6) "triggers in the lawyer's mind the category 'intentional torts,'" *Geiger*, 523 U.S. at 61, 118 S.Ct. at 977, this recognition of a logical association is not the same as saying the two are one and the same. *In re Miller*, 156 F.3d 598, 604 (5th Cir.1998). Furthermore, while *Geiger* clearly requires a "deliberate or intentional injury," *Geiger*, 523 U.S. at 61, 118 S.Ct. at 977, the Court never explained what is necessary to satisfy this requirement. *In re Baldwin*, 245 B.R. 131, 135 (9th Cir. BAP 2000).

Compounding the fact that *Geiger* did not clarify the meaning of § 523(a)(6) as precisely as one might wish, is the fact that, in some respects, it also appears to establish a largely subjective standard—requiring an actual intent to cause injury. A debtor, however, will almost always be able to come forward with innocent explanations for its actions, testifying that "I did not intend to ...." This is particularly true in cases involving the conversion of collateral because a debtor's actions with respect to a creditor's collateral are rarely motivated by a desire to injure either the creditor or its collateral. *See, In re Kidd*, 219 B.R. 278, 284 (Bankr.D.Mont. 1998). Instead, the wrongful use of a creditor's collateral often represents a last ditch effort to save failing business or personal finances and is motivated by the debtor's genuine, but unrealistic, belief that a change in fortune will permit the payment of all its debts, including the debt to the secured creditor. The case law is replete with examples of this behavior. *E.g., In re Gagle*, 230 B.R. 174 (Bankr.D.Utah 1999); *In re Wikel*, 229 B.R. 6 (Bankr.N.D.Ohio 1998); *In re Powers*, 227 B.R. 73 (Bankr.E.D.Va. 1998).

Trying to resolve *Geiger's* ambiguities has lead to largely unnecessary inquiries into such things as whether the debtor's actions "necessarily caused" or were "substantially certain to cause" injury and the extent to which the debtor "knew" or "believed" that this was so. *See e.g., Miller*, 156 F.3d at 604, 606(substantial certainty of harm or subjective motive to do harm); *State of Texas ex rel Board of Regents v. Walker*, 142 F.3d at 813, 823–24 (5th Cir.

1998)(act necessarily caused or was substantially certain to cause harm or done with subjective motive to do harm); *In re Markowitz*, 190 F.3d 455, 464 (6th Cir.1999)(debtor desires to cause the consequences or believes they are substantially certain to result); *Baldwin*, 245 B.R. at 136(same); *In re Kaczmarski*, 245 B.R. 555, 561 (Bankr.N.D.Ill.2000)(debtor acts with the subjective intent to injure or knowledge that injury is substantially certain); *In re Sintobin*, 253 B.R. 826, 829 (Bankr.N.D.Ohio 2000)(debtor intends to cause injury or is substantially certain that injury will occur). These formulations suffer because they are at once too rigorous and, yet, may not be rigorous enough. To the extent they focus on the debtor's knowledge or belief that its actions would cause (or have a substantial certainty to cause) harm, they tend to overemphasize the debtor's subjective motivation. At the same time, however, by allowing the construction of a causal chain which links the debtor's actions to the creditor's injury, it is far too easy to slide backwards from an intentional injury or one that is substantially certain, through one that necessarily causes harm, *see, Miller*, 156 F.3d at 604; *Walker*, 142 F.3d at 823, 824, into the intentional act that causes injury which *Geiger* clearly excludes.

. . . .

The key to applying *Geiger* ... is to accurately identify the creditor's true injury. It is easy to confuse the unique damage caused by the debtor's action with the creditor's true injury and it is that confusion that leads to the construction of causal chains linking action with injury. Nonetheless, the true injury is not the unique or case specific damages that are somehow monetized and then memorialized in a money judgement.

Those damages are only the manifestation of the true injury. They indicate the magnitude of the creditor's injury, not whether an injury has occurred. Admittedly, the magnitude of the injury will influence whether a creditor is interested in pursuing the matter and what, if anything, it may recover should it do so. Nonetheless, the lack of damage does not necessarily mean that no injury has occurred, it means only that no real harm has come of it. Indeed, it is the recognition that there can be injury without harm that lies behind the opportunity to recover nominal damages.

The creditor's true injury occurs on an abstract level. It is the debtor's invasion of the creditor's legally protected right. The court should focus on this injury, as opposed to the resulting damage, when it asks whether the injury was intentional. When it does so, the answer will usually be relatively obvious because the debtor's action *is* the injury. For example, in a case involving assault and battery, the true injury is not the creditor's broken jaw, but rather, the unconsented to touching that produced the broken jaw. Consequently, the question to ask is not whether the debtor intended to break the creditor's jaw, but instead, whether the debtor intended to hit the creditor. In defamation cases, the true injury is not the damage to the creditor's reputation; it is the publication of falsehoods about the creditor that led to the damaged reputation. Consequently, the proper question is not whether the debtor intended to injure the creditor's reputation, but instead, whether the debtor intended to publish the defamatory remarks. Similarly, in the conversion of collateral scenario, the true injury is not that the creditor's debt goes unpaid. The true injury is that the creditor's collateral was wrongly or im-

properly disposed of and that the proceeds were used for purposes other than payment of the obligation that property secured. *See, In re LaGrone,* 230 B.R. 900, 904 (Bankr.S.D.Ga.1999). Consequently, the proper question is not whether the debtor intended that its secured creditor would go unpaid. Instead, the question to ask is whether the debtor intended to improperly use the creditor's collateral and/or its proceeds for purposes other than the payment of the debt that property secured. If so, there is an intentional injury.

Just because the debtor may have intentionally injured the creditor is not enough to make the resulting debt nondischargeable. Section 523(a)(6) has two components. The injury must not only be willful (intentional); it must also be malicious. This requirement is separate and distinct from the issue of willfulness. *See, Kimzey,* 761 F.2d at 424; *Markowitz,* 190 F.3d at 463; *In re Scarborough,* 171 F.3d 638, 641 (8th Cir. 1999), *cert. denied,* 528 U.S. 931, 120 S.Ct. 330, 145 L.Ed.2d 258 (1999). *But see, Miller,* 156 F.3d at 606 (*Geiger* established a unitary concept for willful and malicious).

"Malicious" means " 'in *conscious* disregard of one's duties or without just cause or excuse; it does not require ill will or a specific intent to do harm.' " *In re Thirtyacre,* 36 F.3d 697, 700 (7th Cir.1994) (quoting *Wheeler v. Laudani,* 783 F.2d 610, 615 (6th Cir.1986)) (emphasis added). Consequently, a debtor's actions are not automatically labeled malicious simply because they are wrongful. *In re Posta,* 866 F.2d 364, 367 (10th Cir.1989). There must also be a consciousness of wrongdoing. *In re Stanley,* 66 F.3d 664, 668 (4th Cir.1995). It is this knowledge of wrongdoing, not the wrongfulness of the debtor's actions, that is the key to malicious under

§ 523(a)(6). *Posta,* 866 F.2d at 367; *In re Cardillo,* 39 B.R. 548, 550 (Bankr. D.Mass.1984). Without it there can be no "conscious disregard of one's duties," *Thirtyacre,* 36 F.3d at 700, only an unconscious one. *Accord, In re Grier,* 124 B.R. 229, 233 (Bankr.W.D.Tex.1991)("Simply because the sale was in violation of the security agreement and was in fact an intentional sale on the part of the debtor should not be enough to trigger a finding of malice."). *See also, Davis,* 293 U.S. at 328, 332, 55 S.Ct. at 153 (a willful and malicious injury does not automatically result from every tortious conversion).

*In re Russell,* 262 B.R. 449, 452–455 (Bankr.N.D.Ind.2001)

As *Russell* notes, a number of post-*Geiger* decisions have gotten sidetracked by focusing on the *specific* injury which the party opposing discharge suffered in fact as a result of the debtor's conduct, rather than focusing on the nature of the personal interest or property interest intended to be affected by the debtor's conduct. It is not the specific injury which occurred which is the focus; rather, it is the intent to cause an injury or to intentionally act in a manner which *the debtor knows* should cause injury—again with the intent to affect the person or property interest of another—that counts. Thus, in a case of alleged conversion of collateral subject to a creditor's security interest, it is the debtor's intent to deprive the creditor of the benefits of its collateral—not the intent to financially harm the creditor by doing so—that counts. In a common Midwestern scenario, the farmer who sells the pigs that he knows are subject to Sixth Fourth Bank's security interest for his crop loan to buy food for his family—without clearing the sale with the bank—and buys food for his family instead of remitting the proceeds to the bank—

acts "wilfully" because he intentionally deprived the bank of its right to control the proceeds from the disposition of its collateral. He doesn't have to be thinking "You crummy bank, now you got no pigs." The fact that he used the proceeds to feed his family instead of to feed the bank's shareholders has nothing to do with his "willful" act to deprive the bank of its just desserts, or its appetizer, or whatever. The measure of wilfulness is a subjective one, but hedged by the common law standards of ordinary contract law. When one signs a document—absent adhesion contract principles or fraud or duress—one is held to the requirements stated in the document, whether or not one took the time to read the document. When a person executes documents which grant a creditor a security interest in property owned by the debtor and which provide under the ordinary and familiar parameters of Article IX of the Uniform Commercial Code that the creditor has rights with respect to the proceeds of that collateral, and one then acts in disregard for that creditor's rights, that person has acted "wilfully" with respect to the creditor's collateral. However, whether or not the "willful" act was also "malicious" requires further inquiry.

That being said, "malicious" intent must be established as a separate element. Under this element, per *Thirtyacre, supra.,* the focus of malice is whether the debtor "*deliberately* or *intentionally*" disregarded his/her obligations with respect to the creditor's interests in the debtor's property.

### FINDINGS OF FACT

Given the foregoing, let's now turn to an analysis of the facts in relation to the foregoing legal principles.

Leroy Whiters was the owner of a 1999 Cadillac Escalade, vehicle identification number 1GYEK13R9XR415608. When he purchased the Escalade as a pre-driven vehicle, it had approximately 28,200 miles on it. He financed the purchase through the dealer from whom he acquired the vehicle; the purchase loan was advanced by Great Bank, an Illinois lender. After he had owned the vehicle for a period of time, he became aware that he might be able to obtain a lower rate of interest on the outstanding balance owed for the Escalade through Bank Calumet. He discussed possible financing with Bank Calumet and was advised that he qualified for a refinancing loan on the vehicle.

Whiters testified that the Escalade was perhaps the second or third vehicle which he had purchased through financing arrangements. As stated, financing of his original purchase of the Escalade was arranged through the dealer. Whiters testified that his prior purchases had been undertaken with a co-signer, and that the co-signer "always took care of everything I needed to do" with respect to the financing arrangements for a vehicle. The Bank Calumet transaction was the first refinancing arrangement into which he had ever entered.

The refinancing transaction was completed at Bank Calumet by a personal meeting between Whiters and Douglas Clapp, a loan officer at the Bank. Mr. Clapp testified that he explained the terms of the transaction to Whiters, and that he explained the various documents that were signed by Whiters at this meeting; Whiters testified that his recollection was that the conference was relatively short, and that if the documents were explained at all, they were not explained in great detail. However, as Whiters acknowledged, the Court finds that he had a full and fair opportunity to read the documents which he signed had he chosen to do so, and that he had an opportunity to ask any questions

that he had concerning the transaction, but that he didn't have any.

Among the documents signed by Whiters at this meeting were a Promissory Note, a Consumer Security Agreement and an Authorization for Payoff. The Promissory Note is dated October 31, 2003 and provides for a loan from Bank Calumet to Whiters in the principal amount of $19,906.26, on which interest accrues at the rate of 5.9000%. The loan was payable in 48 payments of $466.50 each per month, with a maturity date of October 30, 2007. The Consumer Security Agreement states that Whiters granted Bank Calumet a security interest in the Escalade. The document further states a representation of his then-current address and a promise that if he changed his address he would promptly notify Bank Calumet of any such change. The security agreement includes the following promise:

> **No Sale** Without Lender s prior written consent I will not sell lease transfer borrow against or otherwise dispose of any of my rights in the Property unless and until all the indebtedness is paid in full

The Authorization for Payoff is a document which was utilized by the Bank to forward the payoff balance to Great Bank on its original loan with Whiters, and includes the following statement under the authorization of Leroy D. Whiters:

> You are instructed upon receipt of the above amount to surrender to BANK CALUMET NA (A) Any documents of title properly endorsed and released.

At the time of the refinancing transaction with Bank Calumet, Whiters was not in possession of the vehicle title; that title was being held by Great Bank. Mr. Clapp testified that the Authorization for Payoff, together with the payoff balance owed by Whiters to Great Bank, was sent by Bank Calumet to Great Bank, and the Court so finds.

Following the forwarding of the payoff balance to Great Bank, Bank Calumet did not obtain the title from Great Bank. Not too long after Bank Calumet's forwarding of what it understood to be the payoff balance to Great Bank, Whiters received a notification from Great Bank that he still owed a small amount on the loan. Whiters testified that he paid this amount to Great Bank, and that Great Bank then sent the Escalade vehicle title to him, which he received and retained in his possession, which the Court so finds.

Mr. Clapp testified that Bank Calumet sent three letters to Whiters regarding the Bank's not having received the vehicle title: letters dated January 7, 2004, March 3, 2004 and May 4, 2004. These letters were sent to the address which Whiters provided to Bank Calumet, and which he represented to be his address in the Consumer Security Agreement. Whiters testified that he does not recall ever receiving the letters: he had moved from the address to which the letters were sent to a residence which he shared with his girlfriend in Indiana, an address of which he did not advise Bank Calumet. Although he picked up his mail at his prior address, he stated that he does not recall ever seeing any of the three letters. The Court finds that Whiters did not read the contents of these letters.

Douglas Clapp had telephone conversations with Leroy Whiters. The first of these was somewhere around April or May of 2004. The initial communication by Mr. Clapp arose because the loan was in default status and because the Bank had not received the title to the vehicle. Mr. Clapp testified that during this first communication, Whiters advised him that he was not working on a full-time basis and was having problems with making the pay-

ments. Mr. Clapp testified that at the time of this first contact, Whiters told him that he did not have the vehicle title. Payment arrangements were made during this telephone conversation, which Mr. Clapp testified Whiters did not maintain.

During a second conversation, Mr. Clapp again discussed with Whiters the delinquent status of the loan. Whiters advised him that the vehicle was having engine problems and that he had taken it to a mechanic's shop. During this conversation Whiters stated that he owed money to the mechanic and that he had turned over the title to the mechanic. This conversation occurred approximately ten days after the first. During this conversation, Whiters told Mr. Clapp that he had received the vehicle title from Great Bank.

Mr. Clapp all told had five or six conversations with Whiters regarding the delinquent status of the loan and the vehicle title. In one of these conversations, Whiters advised Mr. Clapp that he had signed the title over to a friend or an acquaintance because that individual was going to fix the vehicle for him, and then would make the payments to Bank Calumet for him.

The Bank's records [7] establish that Whiters made a payment of $466.50 on November 26, 2003; a payment of $482.00 on January 29, 2004; a payment of $482.00 on February 26, 2004; a loan fee payment of $75.00 on March 3, 2004; a payment of $482.00 on March 25, 2004; a payment of $482.00 on April 29, 2004; a payment of $482.00 on May 25, 2004; a payment of $482.00 on June 29, 2004; a payment of $482.00 on July 28, 2004; and what appear to be a loan fee payment of $125.00 on

October 7, 2004 and a loan fee payment of $125.00 on October 7, 2004. The Bank's records also seem to indicate that a payment of $483.00, designated as "loan fee payment", was made on January 7, 2005. The balance owed to Bank Calumet on its records as of July 26, 2005 was $18,974.72. As of that date, Whiters, according to the Bank's records, had made payments applied to principal in the amount of $2,829.57, and payments applied to interest in the amount of $902.43.

At the time he obtained the refinancing loan from Bank Calumet, Whiters knew that Great Bank was holding the title to the Escalade. He understood that in order to own a motor vehicle, a title certificate in his name had to exist. However, in every prior transaction, either the dealer from whom he purchased the vehicle or the co-signer for the loan took care of all the paperwork, including anything that related to a certificate of title.

Whiters testified that in a conversation/conversations with Douglas Clapp, he advised Mr. Clapp that the car had mechanical problems and required repairs. He stated that he received the vehicle title from Great Bank in approximately March of 2004. The license plates on the vehicle had expired, and Whiters testified that he met an individual who told him that he could arrange to get the vehicle repaired, but that he could not do so until new license plates had been put in place on the vehicle. Whiters testified that in order to obtain the license plates, as he understood his transaction with the person who was to cause the repairs to be made to be and to require, he signed the vehicle title over to an individual named Lashon B. Parker.

---

7. The Court has done its best to decipher the payment history in the Bank's records. No definitive explanation of the payments evidenced by those records was provided at the trial—a statement not in any manner meant to imply that any should have been. The critical fact is that the Bank's records clearly disclose that Whiters made loan payments to the Bank *after* he transferred the title to the Escalade.

Whiters testified that it was Parker who advised him that he could arrange to get the vehicle fixed if plates could be acquired for it, and that signing the title over to Parker was necessary in order for the plates to be obtained.

Whiters testified that the repairs needed to the vehicle included a new oil pump, repair of damage to the hood, repair to a running board on the side of the car—with the primary problem being the operation of the vehicle because of the oil pump problems.

Whiters testified that he signed the vehicle title over to Parker either in April or May of 2004, but probably in May. He did not advise the Bank that he was going to endorse the title to Parker in advance of his doing so. Whiters testified that he understood that the vehicle was collateral for the loan he had obtained from Bank Calumet, and that he essentially understood that the Consumer Security Agreement provided the Bank with its collateral interest in the vehicle.

The transaction with Parker presents contradictory statements made by Whiters in his testimony. At one point he stated that the agreement with Parker was that Parker would cause the vehicle to be repaired and then would purchase the vehicle from Whiters, with the purchase price to be the outstanding balance of the loan obtained from Bank Calumet, which Parker was to assume and pay in the ordinary course of the monthly payments due on the loan. In response to a question from the Bank's counsel, Whiters stated that when he signed the vehicle title over to Parker, Whiters intended that Parker would then possess the vehicle and would make all the remaining loan payments to Bank Calumet. However, in response to questions from his attorney, Whiters testified that at the time he signed the vehicle title over to Parker he did not intend to sell the vehicle to Parker, but rather only signed the title over so that the car could be repaired. The Court finds that Whiters and Parker ultimately arrived at an arrangement whereby Whiters transferred the title to the Escalade to Parker in exchange for Parker's promise that he would take over and complete the payments owed by Whiters to Bank Calumet; i.e., that Whiters in fact sold the Escalade to Parker. However, even if the Court were to find that Whiters transferred the title to Parker in order to merely repair the vehicle, and that Whiters intended that he would remain the owner of the Escalade, the result of this decision would be the same.

The value of the Escalade at the time of its transfer to Parker, given the terms of the transaction between Whiters and Parker, was the outstanding balance of the loan owed to Bank Calumet, which was $20,316.73. This is the value which Whiters, as the seller of the vehicle, placed upon the vehicle by agreeing to sell it to Parker for the amount of the outstanding indebtedness owed to Bank Calumet.

Whiters testified that after he delivered the vehicle title and the vehicle to Parker, he saw Parker driving it around a couple of times. He attempted to contact Parker, but could never get in touch with him. Finally, he reported to both the Hammond Police Department and the Fraud Department of the Secretary of State that Parker had defrauded him by causing him to sign the vehicle title over to Parker, and that Parker had then essentially skipped out with no trace of the vehicle to be found. Despite these attempts, the vehicle was never recovered, and Bank Calumet neither received the title to the vehicle nor realized any proceeds from its collateral.

## CONCLUSIONS OF LAW

As delineated previously in this decision in excruciating detail, in order to succeed

on its assertions under 11 U.S.C. § 523(a)(6), Bank Calumet must establish the following elements by a preponderance of the evidence:

1.  That Whiters' actions caused an "injury" to the property interest of Bank Calumet in the Escalade.

2.  That Whiters' actions which caused the injury to that property interest were the result of "willful" conduct by Whiters by which he intended to effect an injury to the Bank's property interest in the vehicle.

3.  That the actions undertaken by Whiters were "malicious" in that they were taken with conscious disregard of his duties with respect to the property interests of Bank Calumet, or without just cause or excuse.

In determining whether the actions were "willful", the analysis is made from a subjective point of view as to Whiters' actual state of mind, and not from an objective point of view as to what a person other than Whiters in those circumstances should have known or should have done.

This case illustrates a principal distinction between pre-*Geiger* and post-*Geiger* analysis under 11 U.S.C. § 523(a)(6). It is without question to the Court that Whiters intentionally transferred the title to the Escalade, and thus ownership of the vehicle, to Parker in a manner which caused injury to the security interest of Bank Calumet in the Escalade. Under the pre-*Geiger* applications employed by most courts under § 523(a)(6), the finding that Whiters' actions were "willful" would have been appropriate. However, in view of the requirement that Whiters by his actions must have intended injury to Bank Calumet's interests in the Escalade, a different result must adhere.

██ It is first necessary to delineate the property interest which is at issue in this case. The principal focus of the Bank's action seems to the Court to be on Whiter's conduct in the context of the handling of the "title" to the subject vehicle, in contrast to Whiter's conduct in relation to the motor vehicle itself. In the Court's view, the result is the same whether one focuses on either the motor vehicle or the title. However, it bears mention that the vehicle title is merely evidence of the official record of the state as to the owner of the motor vehicle described in it, and also a necessary conduit for the perfection of a security interest in the motor vehicle. Whether or not Bank Calumet had obtained possession of the certificate of title to the subject vehicle, Whiters still would have owned that vehicle, and Bank Calumet would still have only had a security interest in it. It is true that if the certificate of title had been delivered to Bank Calumet, it would have then enabled Bank Calumet to perfect its security interest in the motor vehicle by means of recordation of its lien interest in the vehicle in the appropriate record, and any transfer of ownership on the state motor vehicle records would have been impossible. However, for the purposes of determining the Bank's property interest at issue in this adversary proceeding, the certificate of title to the motor vehicle has value only to the extent, and to the same extent, as the vehicle itself has value as an article of commerce. One does not buy or sell motor vehicle titles; rather, one buys or sells motor vehicles, and thus the certificate of title itself [absent a circumstance in which the document itself has intrinsic value, e.g., the official title for Henry Ford's first Model A or T] has no inherent value apart from the vehicle to which it pertains. As a result, the "debt" which Bank Calumet seeks to except from discharge arises from its claim under its security agreement, i.e., essentially that upon disposition of the vehicle by Whiters either the sales proceeds

of that disposition would be turned over to the Bank to be applied toward Whiters' obligation to the Bank, or arrangements satisfactory to the Bank to protect its property interests in the vehicle as collateral for that debt would have been made. The Bank's property interest subject to this adversary proceeding is, therefore, the value of the Bank's interest in the motor vehicle as an item of commerce arising from its security interests in that property.

Properly framed, the issue is, did Whiters act to cause a "willful" injury to Bank Calumet's property interest in the Escalade when he sold the vehicle to Parker under the circumstances, and subject to the arrangements, found by the Court as stated above? Phrased another way, did Whiters intend to injury the Bank's security interest in the vehicle when he sold the vehicle to Parker in the manner in which that transaction was accomplished? The answer is "no".

■ The evidence establishes without refutation that the vehicle was in need of repairs. Although perhaps not the wisest move, the Court has found that Whiters at least in part signed the title over to Parker so that arrangements could be made for repair of the vehicle. Quite to the contrary of injuring the Bank's security interests in the Escalade, repair of the vehicle would have enhanced the Bank's interests in the vehicle. Thus, to the extent that the transaction between Whiters and Parker by which the title was transferred to Parker was undertaken to repair the vehicle, there was clearly no intent to injure the Bank's interests by doing so.

What about the alternative scenario in which, as determined by the Court, Whiters sold the vehicle to Parker in a transaction in which the agreement was that Parker would assume and fully pay the balance of the obligation owed by Whiters to Bank Calumet? There can obviously be no sustainable conclusion of law that this type of transaction involved an intent to injure Bank Calumet, because the intent of the transaction was to actually arrange for full satisfaction of the debt owed to Bank Calumet. The lack of "willful" intent to injure the Bank's interests is further established by the fact that subsequent to transfer of the title to Parker, Whiters made payments to the Bank with respect to the loan transaction. More critically, this was not a transaction in which a debtor sells property subject to a security interest for cash and then fails to turn over the proceeds to the secured party. There is no evidence in this record that Whiters received any consideration from Parker with respect to this transaction, and this again, emphasizes the lack of Whiters' intent to harm the Bank's interest in the Escalade. Finally, lack of intent to injure is emphasized by the fact that Whiters reported his suspicions regarding Parker to appropriate authorities, actions which he would not have undertaken had he actually intended to injure the Bank's interests in the vehicle.

Based upon the record, the Court concludes that Whiters did not act in a "willful" manner with respect to Bank Calumet's interests in the Escalade.

■ The foregoing determination essentially moots any issue regarding whether or not Whiters' conduct was "malicious". However, the Court determines that Whiters' actions were "malicious". The Consumer Security Agreement which Whiters signed, and had a full and fair opportunity to read and comprehend prior to his execution of it, states unequivocally that he would not sell, transfer, or otherwise dispose of any of his rights in the Escalade until the indebtedness to Bank Calumet had been paid in full, without the Bank's prior written consent. This promise gave rise to a duty on the part of Whiters to

conduct himself in accordance with that provision of the security agreement—a duty of which he was aware—and his failure to obtain the Bank's written consent to the sales transaction with Parker in advance of his undertaking it was done with conscious disregard of his duties to the Bank, and in addition was done without just cause or excuse.

The Court's determination moots the need to decide definitively the value of the property interest of Bank Calumet which would constitute its "debt" for the purposes of § 523(a)(6). The Court will note, however, as was stated on the record at the trial, that Bank Calumet's attorney did an outstanding job of submitting into the record evidence which establishes that fact, despite being totally surprised by the Court's position with respect to the admissibility of NADA data to establish the value of a motor vehicle.

Based upon the facts, the result in this case is both mandated by *Geiger, supra,* and is different under the *Geiger* analysis than would have been the case had the pre-*Geiger* analysis adopted by the Sixth and Tenth Circuit Courts of Appeal and other courts which followed their analysis been applied. The determinations which the Court has made in relation to Whiters' conduct simply will not sustain a conclusion that the debtor acted with an intent to injure the Bank's property interests in the Escalade.

The Court determines that Bank Calumet shall take nothing by its action, and that any 1 "debt" of Whiters to Bank Calumet is not excepted from discharge in his Chapter 7 case.

IT IS ORDERED, ADJUDGED AND DECREED that any debt of Leroy Deon Whiters to Bank Calumet with respect to the loan transaction involving refinancing of a loan for a 1999 Cadillac Escalade-including any debt arising from Whiter's transfer of title to, or disposition of, the Escalade—is not excepted from discharge in Chapter 7 case number 04–65856.