In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1162

In re Michael Frain,

Debtor-Appellee,

Appeal of Patrick F. O'Shea and
Roger L. Schoenfeld

Appeal from the United States District Court
for the Northern District of Illinois, Eastern
Division.
No. 98 C 5651--David H. Coar, Judge.

Argued September 22, 2000--Decided October 30,
2000

   Before Posner, Manion, and Evans, Circuit
Judges.

   Manion, Circuit Judge.  Michael Frain
filed for Chapter 7 bankruptcy.
Appellants Patrick O'Shea and Roger
Schoenfeld filed a complaint under the
Bankruptcy Code, 11 U.S.C. sec.
523(a)(4), seeking nondischargeability of
debts owed to them from a business
relationship they had with Frain. The
bankruptcy court held that the asserted
debts were dischargeable, and the
district court affirmed. O'Shea and
Schoenfeld appeal. We reverse and remand
for further proceedings.

I.

   In May 1989, Michael Frain, Patrick
O'Shea, and Roger Schoenfeld formed a
closely held corporation called the
Preferred Land Title Insurance Company.
Under the shareholder agreement, Frain
was Chief Operating Officer and possessed
50% of the shares of the corporation.
O'Shea and Schoenfeld were both directors

and each held 25% of the shares. Frain was authorized to make day-to-day business decisions and all decisions affecting the normal operations of the corporation. The shareholder agreement further provided that major decisions required consent by 75% of the shares of the corporation, although certain decisions required a unanimous vote. Anything requiring a majority vote was required to have the approval of Frain and either O'Shea or Schoenfeld.

The shareholder agreement set a specific salary formula for Frain during the first three years of the corporation. He was to receive $70,000 the first year with annual increases based on the Consumer Price Index (CPI). The salary provision expired in 1992. Frain continued in his position as Chief Operating Officer after the end of the three-year term, and increased his salary annually well above the CPI formula set by the initial salary provision. The shareholder agreement, however, also provided that "[n]o salaries, bonuses, or other compensation shall be paid to a shareholder . . . unless set forth herein or approved by a unanimous vote of the Board of Directors." O'Shea and Schoenfeld were aware that Frain was still receiving a salary, but at the time did not know of the salary increase.

The shareholder agreement also prioritized distributions of corporate cash flow. Because it was a so-called "subchapter S corporation" (see 26 U.S.C. sec. 1361), income and taxes were passed through directly to the shareholders. The agreement designated the distributions in the following order: first, payments to the shareholders for payment of federal and state income taxes in proportion to ownership of shares of the corporation; second, payments of any outstanding shareholder loans; and third, payments of the balance to the shareholders also in proportion to their ownership of shares. Frain made shareholder distributions--the third priority--before repaying shareholder loans. O'Shea and Schoenfeld protested but accepted and deposited their shareholder distributions.

The corporation ceased operation in

December, 1995. Frain subsequently filed for relief under Chapter 7 of the Bankruptcy Code. O'Shea and Schoenfeld filed a Dischargeability Complaint in the bankruptcy court. See In re Frain, 222 B.R. 835 (Bankr. N.D. Ill. 1998). Apparently outstanding loans were owed to one or both of the plaintiffs. They argued that these debts were not dischargeable pursuant to the Bankruptcy Code, sec. 523(a)(4), which provides that an individual debtor is not discharged from any debt "for fraud or defalcation while acting in a fiduciary capacity." The bankruptcy court held that there was no fiduciary relationship for purposes of sec. 523(a)(4), and accordingly that the alleged debts were dischargeable. The district court affirmed on the same basis. O'Shea and Schoenfeld appeal, alleging that the district court erred in its determination that no fiduciary relationship existed.

II.

Section 523(a)(4) of the Bankruptcy Code provides that "[a] discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt . . . for fraud or defalcation while acting in a fiduciary capacity."

The bankruptcy court and the district court held that there was no fiduciary relationship between Frain and appellants because the terms of the shareholder's agreement did not create a fiduciary relationship under this circuit's case law. We review the bankruptcy and district court's legal findings and contract interpretations de novo. See In re Scott, 172 F.3d 959, 966 (7th Cir. 1999); GNB Battery Technologies, Inc. v. Gould, Inc., 65 F.3d 615, 621 (7th Cir. 1995). Findings of fact, however, are reviewed for clear error. See Scott, 172 F.3d at 966.  In this appeal, the relevant facts are not disputed. The dispute is over the lower courts' interpretation of the shareholder agreement and whether those courts correctly applied the law to the facts. Accordingly, we apply de novo review.

This court has defined a fiduciary

relationship under sec. 523(a)(4) as "a difference in knowledge or power between fiduciary and principal which . . . gives the former a position of ascendancy over the latter." In re Marchiando, 13 F.3d 1111, 1116 (7th Cir. 1994). See also Woldman v. Johnson, 92 F.3d 546, 547 ("section 523(a)(4) reaches only those fiduciary obligations in which there is substantial inequality in power or knowledge in favor of the debtor seeking the discharge and against the creditor resisting discharge.").

A "fiduciary duty" under this test covers circumstances which, although not comprising a literal "trust," do "call for the imposition of the same high standard." See Marchiando, 13 F.3d at 1115 (citing Restatement (Second) of Trusts sec. 2, comment b (1959)). For example, a lawyer-client relation, a director-shareholder relation, or a managing partner-limited partner relation all call for the principal to "repose a special confidence in the fiduciary." See id., 13 F.3d at 1116.

The existence of a "fiduciary relationship" is a matter of federal law. It bears emphasis that not all fiduciary relationships qualify under the Bankruptcy Code. See Woldman, 92 F.3d at 547 (7th Cir. 1996) ("[O]nly a subset of fiduciary obligations is encompassed by the word 'fiduciary' in section 523(a)(4)."). A fiduciary relation only qualifies under sec. 523(a)(4) if it "imposes real duties in advance of the breach." See Marchiando, 13 F.3d at 1116. In Marchiando, we recognized the well-established principle that, for purposes of sec. 523(a)(4), the fiduciary's obligation must exist prior to the alleged wrong. A constructive trust, for example, will not qualify for purposes of sec. 523(a)(4), since the obligations do not exist until the wrong is committed. See Marchiando, 13 F.3d at 1115 (citing Davis v. Aetna Acceptance Co., 293 U.S. 328, 333 (1934); In re Bennett, 989 F.2d 779, 784 (5th Cir. 1993); In re Tiechman, 774 F.2d 1395 (9th Cir. 1985)).

As this court has noted, there is a "broad spectrum of fiduciary obligations from the case in which a trustee defrauds

a child beneficiary or a lawyer defrauds a client or a general partner defrauds a limited partner." Woldman, 92 F.3d at 547 (7th Cir. 1996). For example, a joint venture between equals will not qualify as a fiduciary relationship. See id. The relationship in this case, however, falls on the fiduciary end of the spectrum.

A difference in knowledge or power can create a fiduciary relationship, see Marchiando, 13 F.3d at 1116. Frain was responsible for the day-to-day business decisions of the corporation, giving him a natural advantage over the other two shareholders in terms of knowledge of the corporation's finances. But it does not necessarily follow that this knowledge was unavailable to appellants. Indeed, it was no secret that Frain was drawing a salary after the initial three-year period, and the appellants themselves received and accepted shareholder distributions from Frain even though they were disgruntled because their loans were not repaid first. Frain's superior knowledge of day-to-day operations was not sufficient in itself to establish a position of ascendancy.

While the parties' access to knowledge and information may have been reasonably similar, the concentration of power was substantially one-sided. The shareholder's agreement was structured to give Frain ultimate power over both his own employment and the direction of the corporation. Frain's control over the day-to-day business of the corporation and ownership of 50% of the shares gave him significant freedom to run the corporation as he saw fit, including oversight of such items as salary and distributions of corporate cash flow. The only real limit to his power was the chance of deadlock; that is, if he voted his 50% one way and O'Shea and Schoenfeld voted their combined 50% the other, nothing would happen. A further reading of the thirty-plus-page contract discloses that "major decisions shall require the consent of the holders of seventy-five percent (75%) of the voting common shares" (with some decisions requiring 100%). The contract defined "major decisions" to include "all decisions affecting the Corporation which are not in the ordinary course of business of the Corporation." So no major

decisions can be made unless Frain agrees. The district court, while noting that O'Shea and Schoenfeld had 50% of the shares and had a balance of power in many areas, emphasized the provision that they could "purchase Frain's interest for $1.00 in the event [he] . . . committed any material breach . . . ." O'Shea v. Frain, 1999 WL 1269352, *3 (N.D. Ill. Dec. 22, 1999).

But the contract requires a majority vote to determine whether to continue Frain's employment. Unless Frain voluntarily terminates his employment, the $1.00 purchase option kicks in only if he is terminated for cause. Obviously that is a major decision requiring 75% of the voting shares; he can't be fired unless he votes in favor of it. Thus the $1.00 purchase option cannot be exercised without Frain's approval.

Both lower courts relied on the $1.00 purchase provision in reaching their decision, on the theory that the power to buy Frain out limited his position of power in the corporation. Theoretically, they were correct. The termination provision did limit Frain's position of ascendancy under the shareholder's agreement, but in practice this power was hollow. Not only is for-cause termination a "major decision" requiring consent of holders of 75% of voting shares, but also the contract specifically provides that in order to terminate Frain for cause, a majority vote was required. And as noted, a majority vote was defined as a vote by 75% of the shares. Since Frain held 50% of the shares, he could be removed by appellants only if he wanted to be removed. Thus, the power for O'Shea and Schoenfeld to independently remove Frain and purchase the corporation for $1.00 did not exist.

III.

A Chief Operating Officer with 50% of the shares who cannot be removed for cause without his consent possesses a position of considerable ascendancy over the other shareholders. All of the decisions made in the ordinary course of business were Frain's to make. All of the major decisions required Frain's agreement. If Frain abused this power,

termination for cause was a tantalizing, but unavailable fiction. This shareholder's agreement was not a system of checks and balances. Frain had more knowledge, and substantially more power, than appellants.

In this case, a fiduciary relationship was created by the structure of the corporation under the shareholder agreement, which had given Frain a position of ascendancy under our case law. Frain argues that violations of a contract entered into by equals are not covered by sec. 523(a)(4). However, Frain had a pre-existing fiduciary obligation to O'Shea and Schoenfeld independent of any breach of contract. This is not a case where a fiduciary relationship was implied from a contract. See Bennett, 989 F.2d at 784 (sec. 523 (a)(4) does not cover fiduciary duty implied from contract). A contract was necessary to the existence of a fiduciary relationship, but the obligations of the contract were not the source of the fiduciary relationship. The source of the fiduciary relationship was Frain's substantial ascendancy over O'Shea and Schoenfeld. Whether any alleged breach of contract was a defalcation is an issue for the bankruptcy court.

We conclude, therefore, that based on the contract Frain possessed an ascendant position in relation to appellants. There was accordingly a fiduciary relationship for purposes of sec. 523(a)(4). The bankruptcy court must now decide whether Frain actually committed any defalcation under sec. 523(a)(4).

REVERSED and REMANDED.