In re Anthony Pete TSIKOURIS
Debtor.

Allan Delange, Chairman and William Blumm, Secretary, on the Behalf of Northwest Indiana Painters Welfare Fund; and John Arvin, Secretary on the Behalf of the Northwest Indiana Painters Joint Apprenticeship & Training Trust Fund, Plaintiffs,

v.

Anthony Pete Tsikouris, Defendant.

Bankruptcy No. 04–63963 JPK.
Adversary No. 04–06220 JPK.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

March 30, 2006.

Samuel T. Miller, Esq., Munster, IN, for Defendant, Anthony Pete Tsikouris.

Thomas E. Moss, Esq., Paul T. Berkowitz & Associates, Ltd., Chicago, IL, for Plaintiffs.

## MEMORANDUM OF DECISION AND ORDER

J. PHILIP KLINGEBERGER, Bankruptcy Judge.

This adversary proceeding was initiated by the Plaintiffs by a complaint filed on November 12, 2004 alleging that the debt owed by the defendant/debtor Tsikouris is excepted from discharge pursuant to 11 U.S.C. § 523(a)(4). The record discloses that service of process was properly made, and that Tsikouris appeared by counsel, who filed an answer to the complaint on January 10, 2005. On February 18, 2005, at a preliminary pretrial conference, the parties indicated to the Court that the facts necessary for final determination of this matter were not in dispute. Therefore, the Court determined that the final disposition of this case would be based upon a stipulated record filed by the parties along with memoranda of law with respect to their contentions based thereon. The *Parties' Stipulation of Facts* was filed on June 22, 2005, and this matter being fully briefed is before the Court for a final determination. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b), 28 U.S.C. § 157(a), and N.D.Ind.L.R. 200.1(a)(2). As agreed by the parties, this matter constitutes a "core" proceeding as defined by 28 U.S.C. § 157(b)(2)(I).

## I. *Materials to be Considered by the Court*

This case has been submitted to the Court on a stipulated record, and thus the factual record is comprised exclusively of the evidence provided by the Parties' Stipulation of Facts filed on June 22, 2005

("Stipulation"). Those facts are the following:

1. Plaintiffs are employee benefit funds within the meaning of and subject to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), providing benefits for employees working within this judicial district. [Stipulation ¶ 4].

2. Local Union # 460 Northwest Indiana International Union of Painters & Allied Trades (Local # 460) is a labor organization engaged in representing and acting for its members in the construction industry. Local Union No. 8 of Gary and Vicinity of the International Brotherhood of Painters and Allied Trades ("Local Union # 8") was a labor organization engaged in representing and acting for its members in the construction industry; Local Union No. 8 and its Trust Funds have been merged with the Union and its Trust Funds. [Stipulation ¶ 5].

3. At all times material to this adversary proceeding, Tsikouris has been the owner and operator of a construction company doing business as Tsikouris Construction. [Stipulation ¶ 6].[1]

4. As the owner and operator of his business, Tsikouris had authority over the contractual relationships and financial transactions of that company. [Stipulation ¶ 7].

5. On June 23, 1998, Defendant Anthony Tsikouris d/b/a Tsikouris Construction signed a Memorandum of Agreement with Local Union No. 8. The Memorandum of Agreement adopted Local Union No. 8's collective bargaining agreement with the Northwest Indiana Chapter of Painting and Decorating Contractors of America and amendments thereto and subsequent agreements between these entities. By signing the Memorandum of Agreement, Tsikouris also adopted the terms and conditions of any Trust Funds Agreements identified in the Collective Bargaining Agreement ("Trust Agreements"). Tsikouris did not thereby become a named administrator of any Trust Fund nor a member of the Plaintiff Union. The collective bargaining agreement and the Trust Agreements obligated Tsikouris to (1) submit monthly reports of the hours worked by Local Union No. 8's members for his company, and (2) make payments of fringe benefit contributions and payroll deductions based on the reported hours worked. Tsikouris also agreed to permit audits to confirm compliance with the collective bargaining agreement(s) and the Trust Fund Agreements. [Stipulation ¶ 8].

6. On September 13, 2001, Tsikouris d/b/a Tsikouris Construction signed a Memorandum of Agreement with Local # 460. The Memorandum of Agreement adopted Local Union No. 8's collective bargaining agreement with the Finishing Contractors Association and amendments thereto. By signing the Memorandum of Agreement, Tsikouris also adopted the terms and conditions of any Trust Funds Agreements ("Trust Agreements"). Tsikouris did not thereby become a named

---

**1.** Paragraph 6 of the Stipulation also states that Tsikouris has been the owner and officer of Tsikouris Construction Company Incorporated, and that this corporation was incorporated on December 12, 1995 and administratively dissolved on October 11, 2001. The contracts between Tsikouris and the Union which the parties apparently deem pertinent have been attached to the Stipulation as Exhibits "A" and "B", and paragraphs 8 and 9 of the Stipulation—as do the exhibits themselves—make clear the fact that contracts involved in this action are solely with Tsikouris individually and do not relate to the corporation. As a result, the obligations which are the subject of this action are a direct "debt" of Tsikouris for the purposes of 11 U.S.C. § 523(a)(4), as that term is defined by 11 U.S.C. § 101(12).

administrator of any Trust Fund nor a member of the Plaintiff Union. The collective bargaining agreement and the Trust Agreements obligated Tsikouris to (1) submit monthly reports of the hours worked by Local Union No. 8's members for his company, and (2) make payments of fringe benefit contributions and payroll deductions based on the reported hours worked. Tsikouris also agreed to permit audits to confirm compliance with the collective bargaining agreement(s) and the Trust Fund Agreements. [Stipulation ¶ 9].

7. During the period from January 1, 1999 through December 31, 2002 (the "audit period"), Tsikouris employed members of Local Union No. 8 and Local # 460 and thereby became obligated to pay contributions and payroll deductions to Plaintiffs, Local # 460 and Local Union No. 8 and its Trust Funds.[2] [Stipulation ¶ 10].

8. The three audits performed for the years 1999 through 2002 revealed that Tsikouris failed to pay all the monthly contributions due Plaintiffs and Local Union No. 8's Trust Funds, plus contractually required interest and liquidated damages on the delinquent principal in the total amount of $35,305.99. [Stipulation ¶ 11].

9. During the audits period, Defendant Tsikouris maintained funds in his bank accounts.[3] [Stipulation ¶ 12]. Tsikouris failed and refused to pay or account for the monies owed to Plaintiffs. [Stipulation ¶ 13]. Instead, Defendant Tsikouris decided to, and did, pay monies from his compa-ny's accounts to others (including himself or his family members, Company and Corporation) rather than pay the delinquent contributions to Plaintiffs.[4] *Id.*

10. Tsikouris possessed and exercised discretionary authority over the funds in his bank accounts that could have been paid to Plaintiffs. [Stipulation ¶ 14].

## II. *Standard of Proof for Non-Dischargeability under 11 U.S.C. § 523(a)(4)*

■ 11 U.S.C. § 523(a)(4) provides that a debt is excepted from discharge if the debt is "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." There are no assertions in this case of embezzlement or larceny. In very general terms, Tsikouris' debt will be excepted from discharge if the Court finds that a fiduciary relationship existed between the parties, and that the debt arose as a result of fraud or defalcation in the context of that fiduciary capacity. *In re Eisenberg,* 189 B.R. 725, 730 (Bankr. E.D.Wis.1995).

■ In an adversary proceeding to determine the nondischargeability of a debt, the burden of proof is on the plaintiff as to each element of the statutory exception to discharge; *In re Kreps,* 700 F.2d 372, 376 (7th Cir.1983); *Zygulski v. Daugherty,* 236 B.R. 646, 653 (N.D.Ind. 1999), *citing, Matter of Scarlata,* 979 F.2d 521, 524 (7th Cir.1992). Furthermore, exceptions to discharge are to be construed

---

**2.** The Parties stipulated that among the contractual obligations between them, Tsikouris was to make payroll (paycheck) deductions payable to certain funds. Such deductions would be for the Vacation/Savings Fund and the Union's working dues assessment. However, the Parties agreed that the amounts due from Tskouris for these specific deductions, if any, are *not in issue* in this adversary proceeding.

**3.** The parties attached, as Exhibit "C" to their stipulation, a summary of several bank accounts for the audit periods detailing deposits, charges and ending balances.

**4.** The Parties attached, as Exhibit "D" to their stipulation, a summary of the Defendant's payments to himself, his family members, Company and Corporation during the audit periods and a summary of the operation of accounts.

strictly against the creditor and liberally in favor of the debtor; *Matter of Scarlata,* 979 F.2d at 524 (*citing, In re Zarzynski,* 771 F.2d 304, 306 (7th Cir.1985)). The United States Supreme Court has held that the standard of proof in non-dischargeability proceedings under § 523(a) is a preponderance-of-evidence standard rather than the more stringent standard of clear and convincing evidence; *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

## III. *Legal Analysis*

The facts of this case may be distilled down to the following essence. Tsikouris was the owner of a business, operated as a sole proprietorship, which employed individuals who were subject to the terms of a collective bargaining agreement entered into between Tsikouris and a union. The union maintained certain employee benefit plans, administered separately from the union itself, to which Tsikouris was contractually obligated to make payments on behalf of the union members he employed from time to time in his business. The benefit plans are subject to the terms of ERISA. Tsikouris failed to make payments as he had promised to these plans; these payments were solely the contractual obligation of Tsikouris as an employer, and were not in any manner derived from funds ostensibly withheld from the employee's wages which were then to be remitted to the plans on behalf of the employees from whom withholdings had been made. The plans are administered by a trustee or trustees; however, Tsikouris never had any involvement with the plans or their management.

As so distilled, the issue in this adversary proceeding is whether the amount of the payments not made by Tsikouris to the union employee benefit plans *for the employer portion of benefit plan contributions* is a debt of Tsikouris excepted from discharge by operation of 11 U.S.C. § 523(a)(4), due to "fraud or defalcation while acting in a fiduciary capacity." And that is the sole issue presented in this case.

The Plaintiffs' counsel has done a yeoman's job of presenting a plethora of case law to the Court which concerns both the issue before the Court, and the collateral issue of the personal liability of a corporate officer or principal for amounts not paid by a corporate employer to an ERISA qualified employee benefit plan. The briefing record is somewhat muddled due to the insertion of this latter fascinating, but totally irrelevant, issue. Tsikouris is personally liable as the direct contracting party for the debt at issue in this case. The issue is simply whether that debt is within the provisions of 11 U.S.C. § 523(a)(4). Whether a corporation's principal is somehow liable personally for payments to be made by a corporation to a union's ERISA-qualified employee benefit plan has *nothing* to do with the issue of whether Tsikouris acted in the "fiduciary capacity" required by 11 U.S.C. § 523(a)(4).[5]

---

**5.** The controlling precedent in the Seventh Circuit is *Sullivan v. Cox,* 78 F.3d 322 (7th Cir.1996). As stated in *Sullivan*:

> The parties do not dispute, and indeed could not dispute, that Section 1145 only creates a federal ERISA obligation for employers who are obligated to make contributions even absent the statute-in other words, those who are obligated under state

law. *Levit v. Ingersoll Rand Fin. Corp.,* 874 F.2d 1186, 1193–1194 (7th Cir.1989); *Plumbers' Pension Fund, Local 130, U.A. v. Niedrich,* 891 F.2d 1297, 1299–1301 (7th Cir.1989), certiorari denied, 495 U.S. 930, 110 S.Ct. 2169, 109 L.Ed.2d 499; see also *Cement & Concrete Workers Dist. Council v. Lollo,* 35 F.3d 29, 36–37 (2d Cir.1994); *Scarbrough v. Perez,* 870 F.2d 1079 (6th

With respect to the issue before the court in this adversary proceeding, the plaintiffs' counsel has also done a yeoman's job of presenting the opinions of many other jurisdictions, included among them federal Circuit Courts of Appeal. Were the issue before the Court one upon which neither the United States Supreme Court nor the United States Court of Appeals for the Seventh Circuit had any controlling precedent, the elucidation of other courts' views would be illuminating and, although obviously not controlling, helpful. However, that is not the case here: this case is absolutely controlled by decisions of both the United States Supreme Court and of the Seventh Circuit Court of Appeals.

The bright line decision of the United States Supreme Court is *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). That case involved what is now conceptually referred to as a "floor plan" financing arrangement between a retail automobile dealer and a lender. Aetna Acceptance Company advanced funds to Davis which Davis used to purchase an Auburn sedan as inventory in his automobile dealership. The contractual arrangements between Aetna and Davis included Davis' granting a "chattel mortgage" (now commonly referred to as a security interest) to Aetna and a trust receipt, by which Davis agreed to hold the automobile as property of Aetna for the purpose of storage, and by which he in addition agreed not to sell or otherwise dispose of the vehicle without the express written consent of Aetna. Davis sold the automobile and did not remit the required loan payoff proceeds to Aetna. He then

Cir.1989); *International Bhd. of Painters & Allied Trades Union v. George A. Kracher, Inc.*, 856 F.2d 1546 (D.C.Cir.1988); *Massachusetts Laborers' Health & Welfare Fund v. Starrett Paving*, 845 F.2d 23 (1st Cir.1988). These cases rejected claims that liability for delinquent pension contributions should extend to a corporation's chief officer under Section 1145. Judge Breyer explained the rationale for this conclusion in *Starrett Paving*, which rests primarily on legislative statements to the effect that ERISA was intended to impose obligations only on parties who were *already* contractually obligated to make contributions. 845 F.2d at 25. Thus, turning to the statute's language, not only must a potentially liable party be an "employer" under Section 1145, he must also be an "employer who is obligated to make contributions."

The cases recognize that Congress did not intend through Section 1145 to upset the general rule that individuals are not liable for corporate debt, see *George A. Kracher*, 856 F.2d at 1550; rather, the general rule is only upset where individuals contractually accept responsibility for corporate liability, thus becoming "employers obligated to make contributions" under Section 1145. There may be other exceptions not at issue here. For example, there are no allegations here that this is a corporate-veil piercing case-that under state or federal law Cox is the corporation or is its alter ego. Nor are there allegations that Cox, as a corporate official, committed fraud or acted in concert with a fiduciary to breach a fiduciary duty. We express no opinion as to whether such allegations would fall into an exception to the rule that Section 1145 does not itself create individual liability, though our cases suggest that such exceptions exist. See *Levit*, 874 F.2d at 1193–1194.

78 F.3d, at 324–325.

The foregoing clearly establishes that the Seventh Circuit has not analyzed the liability of an individual for unpaid "employer component" obligations to an ERISA-qualified employee benefit plan under the "fiduciary" principles of ERISA, and there is nothing in Seventh Circuit law which causes Tsikouris to be a "fiduciary" with respect to the debt at issue in this case. The unpublished decision of the Honorable Rudy Lozano in *Painting Industry Insurance Fund of Local No. 8, et al v. R. Company, Inc., et al.* does not address the issue in this case. The facts stated in *R. Company, Inc.* do not delineate the scope of that decision in relation to *"employer component"* payments, as contrasted to monies withheld by an employer from its employees' wages-as far as appears in that decision, it may deal with solely the latter.

filed a Chapter 7 bankruptcy case, and Aetna asserted that Davis' obligation to remit the proceeds of the sale to the extent of its advanced credit was excepted from discharge by reason of his fraud or misappropriation while acting in a fiduciary capacity. The statutory exception with respect to fiduciary obligations under which Aetna proceeded is essentially identical to that which is now 11 U.S.C. § 523(a)(4). In determining that Davis did not occupy the position of a fiduciary in relation to Aetna, the United States Supreme Court stated:

> The respondent contends that, irrespective of willfulness or malice, the petitioner is within the exception declared by subdivision 4; his liability arising, it is said, from his fraud or misappropriation while acting in a fiduciary capacity. The meaning of these words has been fixed by judicial construction for very nearly a century. *Chapman v. Forsyth,* 2 How. 202, 11 L.Ed. 236, decided in 1844, is a decision to the effect that, within the meaning of a like provision in the Act of 1841 (5 Stat. 440), a factor does not act in a fiduciary capacity; the statute 'speaks of technical trusts, and not those which the law implies from the contract.' 2 How. at page 208, 11 L.Ed. 236. The scope of the exception was to be limited accordingly. Through the intervening years that precept has been applied by this court in varied situations with unbroken continuity. *Neal v. Clark,* 95 U.S. 704, 24 L.Ed. 586; *Hennequin v. Clews,* 111 U.S. 676, 682, 4 S.Ct. 576, 28 L.Ed. 565; *Noble v. Hammond,* 129 U.S. 65, 68, 9 S.Ct. 235, 32 L.Ed. 621; *Upshur v. Briscoe,* 138 U.S. 365, 11 S.Ct. 313, 34 L.Ed. 931; *Crawford v. Burke,* [195 U.S. 176, 25 S.Ct. 9, 49 L.Ed. 147] supra; *Tindle v. Birkett,* [205 U.S. 183, 27 S.Ct. 493, 51 L.Ed. 762] supra. *Cf. Cronan v. Cotting,* 104 Mass. 245, 6 Am.Rep. 232; *Clair v. Colmes,* 245 Mass. 281, 139 N.E. 519. It is not enough that, by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio. He must have been a trustee before the wrong and without reference thereto. In the words of Blatchford, J.: 'The language would seem to apply only to a debt created by a person who was already a fiduciary when the debt was created.' *Upshur v. Briscoe,* supra, at page 378 of 138 U.S., 11 S.Ct. 313, 318. Was petitioner a trustee in that strict and narrow sense?

> We think plainly he was not, though multiplicity of documents may obscure his relation if the probe is superficial. The only writing at all suggestive of a trust is the one that is characterized as a trust receipt. What effect would be given to it if it stood alone there is no occasion to consider. It does not stand alone, but is a member of a group which must be read with a collective meaning. The note, the chattel mortgage, the trust receipt, and the bill of sale were made at the same time. We must view them all together. Clearly the respondent's only interest in the car was as security for the debt; this is the central fact, the coordinating element, that unifies the whole transaction. The bill of sale may seem to make the creditor a purchaser; whatever its recitals, it is a mortgage in another form. *Whittemore v. Fisher,* 132 Ill. 243, 24 N.E. 636. The trust receipt may state that the debtor holds the car as the property of the creditor; in truth, it is his own property, subject to a lien. *Barchard v. Kohn,* 157 Ill. 579, 585, 586, 41 N.E. 902, 29 L.R.A. 803. The substance of the transaction is this, and nothing more, that the mortgagor, a debtor, has bound himself by covenant not to sell the mortgaged chattel

without the mortgagee's approval. The resulting obligation is not turned into one arising from a trust because the parties to one of the documents have chosen to speak of it as a trust. Cf. *In re Butts* (D.C.) 120 F. 966, 971; *Bloomingdale v. Dreher* (C.C.A.) 31 F.(2d) 93. The relation would be no different if the duty had been stated in terms of covenant alone without descriptive epithet. A mortgagor in possession before condition broken is not a trustee for the mortgagee within the meaning of this statute, though he has charged himself with a duty to keep the security intact. Cf. *Ten Eyck v. Craig*, 62 N.Y. 406, 422. 55 S.Ct. at 153–154. *Davis* has never been overruled by the United States Supreme Court, and to the knowledge of this Court has never been altered or modified in the context of the determination made under what is now 11 U.S.C. § 523(a)(4).

■ *Davis* presents a factual circumstance in which the debtor was in possession of *existing property subject to the property interest of a secured creditor,* and in which *his debt to that creditor existed prior to his coming into possession of that property.* In terms of the law of trusts, there was thus an actual *res,* if you will-a motor vehicle in Davis' possession-in which a creditor to whom Davis owed a debt had a clearly defined property interest arising from its chattel mortgage in that identified *res.* This is not a case in which Davis merely owed a debt to Aetna; rather, Aetna had a property interest in the proceeds of sale received by Davis when he sold the item subject to the creditor's property interest. Despite Davis' being in possession of funds impressed with a security interest of Aetna, the United States Supreme Court held that Davis was not acting in a "fiduciary capacity" with respect to those funds. The factual circumstances in *Davis*

are a much stronger case for the impression of a fiduciary relationship upon the debtor than are those presented in this case. Here, an individual contractually obligated himself to make payments to the plaintiffs, but the plaintiffs had no separately identifiable property interest in the general business income or receivables from which those payments were to be made. If a fiduciary relationship cannot arise from a debtor's holding of proceeds of sale of a secured creditor's collateral, how can a fiduciary relationship under § 523(a)(4) arise in a circumstance in which there exists no fund "impressed" with a proprietary interest of that creditor? The answer is: There is no fiduciary relationship in this case under the principles of *Davis.*

A Supreme Court precedent concludes the necessary analysis of this case. However, there are two United States Court of Appeals for the Seventh Circuit cases which provide additional precedent for the determination that Tsikouris was not "acting in a fiduciary capacity" in relation to the "debt" which the plaintiffs seek to except from his discharge.

Putting aside *Davis, supra.,* this case is absolutely controlled by *In matter of Marchiando,* 13 F.3d 1111 (7th Cir.1994). In that case, the debtor was a licensed lottery agent for the State of Illinois, and under the contractual provisions of her arrangement with the State and by statute was deemed to be a "fiduciary" with respect to the State of Illinois for monies she received from the sale of Illinois lottery tickets. She failed to remit the proceeds of certain of those sales to the State of Illinois; when she filed bankruptcy, the State sought to except her liability to it for turnover of the sales proceeds from discharge under 11 U.S.C. § 523(a)(4).[6] The

6. A portion of the plaintiffs' presentation to the Court addresses the concept of a "statuto-

612

United States Court of Appeals for the Seventh Circuit addressed the concept of "fiduciary capacity" as follows:

Bankruptcy is both a creditor's remedy and a debtor's right. The discharge of the bankrupt's debts is an essential feature of the second function; it is what enables the bankrupt to get a "fresh start." It is also, depending on the bankrupt's future income prospects, a potentially great harm to creditors. When the bankrupt is a trustee and the creditor a beneficiary of the trust, the balance has been deemed to incline against discharge. Nondischarge becomes another token of the law's imposition of the highest standard of loyalty and care on trustees. In a trust relationship the settlor and beneficiary repose "trust" in a literal sense in the trustee, and the abuse of that trust is considered a serious wrong.

The high standard of loyalty and care that the law imposes on trustees is encapsulated in the term "fiduciary duty." Once it entered the law's bank of concepts, it became available for use in situations that, while not involving trusts in a formal sense, seemed to call for the imposition of the same high standard. *Restatement (Second) of Trusts* § 2, comment b (1959). So a lawyer is deemed the fiduciary of his client, even if he does not manage a fund entrusted to him by the client, *Maksym v. Loesch,* 937 F.2d 1237, 1241–42 (7th Cir.1991), and a managing partner is a fiduciary of the limited partners, corresponding to shareholders of a corporation, although again there is no trust in the conventional sense.... To complicate the picture further, the cases are divided over the question whether a statute that, as in

our case, deems a debtor a fiduciary in order to enlarge the remedies for default makes the debtor a "fiduciary" for purposes of section 523(a)(4).

. . .

The key to knitting the cases into a harmonious whole is the distinction stressed in *Davis* and other cases between a trust or other fiduciary relation that has an existence independent of the debtor's wrong and a trust or other fiduciary relation that has no existence before the wrong is committed. A lawyer's fiduciary duty to his client, or a director's duty to his corporation's shareholders, pre-exists any breach of that duty, while in the case of a constructive or resulting trust there is no fiduciary duty until a wrong is committed. The intermediate case, but closer we think to the constructive or resulting trust pole, is that of a trust that has a purely nominal existence until the wrong is committed. Technically, Marchiando became a trustee as soon as she received her license to sell lottery tickets. Realistically, the trust did not begin until she failed to remit ticket receipts. For until then she had no duties of a fiduciary character toward the Department of Lottery or anything or anyone else. Until then, she was just a ticket agent. The state, afraid that she might be a disloyal agent, required her to keep the proceeds of her ticket sales separate from her other funds and threatened her with criminal punishment if she did not. These were devices by which the state sought to establish and enforce a lien in the proceeds, the better to collect them securely. The analogy is to "floor planning," where a bank insists that the

ry" fiduciary, a concept which is totally addressed by, and totally disavowed by, *Mar-*

*chiando.*

proceeds of any sale from inventory be remitted to the bank to pay down the principal of the loan as soon as the sale is made. Such arrangements, held not to come within the scope of section 523(a)(4) in *Davis* and *Long*, are remote from the conventional trust or fiduciary setting, in which someone-a lawyer for example, or a guardian, or a managing partner-in whom confidence is reposed is entrusted with another person's money for safekeeping. See also *In re Iowa R.R.*, 840 F.2d 535, 541–45 (7th Cir. 1988).

If we probe more deeply the distinction between the fiduciary relation that imposes real duties in advance of the breach and the fiduciary relation that does not we find that the first group of cases involve a difference in knowledge or power between fiduciary and principal which, as we put it in *Maksym v. Loesch, supra*, 937 F.2d at 1242, gives the former a position of ascendancy over the latter. See also *Kham & Nate's Shoes No. 2, Inc. v. First Bank*, 908 F.2d 1351, 1357 (7th Cir.1990); *Weinberger v. Kendrick*, 698 F.2d 61, 78–79 (2d Cir.1982) (Friendly, J.); *Gratz v. Claughton*, 187 F.2d 46, 49 (2d Cir.1951) (L.Hand, J.). The fiduciary may know much more by reason of professional status, or the relation may be one that requires the principal to repose a special confidence in the fiduciary; both factors are present in the case of a lawyer-client relation and also the relation between director and shareholder or managing partner and limited partner. Or the principal may be a child, lacking not only knowledge but also the power to act upon it. These are all situations in which one party to the relation is incapable of monitoring the other's performance of his undertaking, and therefore the law does not treat the relation as a relation at arm's length between equals.

All the cases except *Quaif* and *Carey* that have held debts nondischargeable by virtue of section 523(a)(4) have involved either express trusts of a conventional variety or fiduciary relations of the kind just described-relations of inequality that justify the imposition on the fiduciary of a special duty, basically to treat his principal's affairs with all the solicitude that he would accord to his own affairs. Nothing of the sort is involved here. The fiduciary is a ticket agent with no edge based on the possession of power or expertise; the principal is the state itself. The inequality of relation that calls for the imposition of fiduciary duties is wholly absent.

If, contrary to our decision in *Judd v. First Federal Savings & Loan Ass'n*, 710 F.2d 1237, 1241 (7th Cir.1983), which holds that the word "trust" in an instrument does not by itself "transform a traditional debtor-creditor relationship into a fiduciary relationship," a fiduciary is anyone whom a state calls a fiduciary-the only principle on which the discharge of Marchiando's debt could be refused-states will have it in their power to deny a fresh start to their debtors by declaring all contractual relations fiduciary. They are not apt to go that far. They are apt to seek a preferred position for their own debts by declaring people who do business with the state fiduciaries of the state or its agencies. Illinois has tried to do this with its ticket agents. If it succeeds, next it can do it with all its other contractors. Libertarians may smile approvingly at the state's equating its bureaucracies to the children and other incompetents who are the classic trust beneficiaries, but we do not think Congress would. The convenience-store keeper who commingles the proceeds of her lottery ticket sales with her other receipts is at a considerable

remove from the lawyer who converts money in his clients' escrow accounts or the bank trust department that invests someone's retirement fund recklessly.

13 F.3d at 1115–1117.

The teaching of *Marchiando* is not only that a statutory or contractual designation of an individual as a "trustee" or "fiduciary" has no real relevance to the determination of "fiduciary capacity" under § 523(a)(4). The primary lesson to be learned from the case is that there must be a "res" in existence *before* the designated "fiduciary" relationship truly arises. In this case, the only "res" there is arose only when Tsikouris did not make payments to the union benefit plans *after* the amount of the required payment was determined. Thus, because there was no "res" prior to that time, Tsikouris did not act in a "fiduciary capacity" in any manner with respect to the "debt" which the Plaintiffs seek to except from his discharge.

We next come to the very problematic § 523(a)(4) case in the Seventh Circuit, *In re Frain*, 230 F.3d 1014 (7th Cir.2000). *Frain* departs from traditional § 523(a)(4) analysis in the Seventh Circuit by its apparent emphasis on the concept of creation of a "fiduciary capacity" arising from a differential in power or knowledge by an individual in a certain relationship of ascendancy over another individual or individuals. *Frain* involved a circumstance explained by the factual statement in the case as follows:

> In May 1989, Michael Frain, Patrick O'Shea, and Roger Schoenfeld formed a closely held corporation called the Preferred Land Title Insurance Company. Under the shareholder agreement, Frain was Chief Operating Officer and possessed 50% of the shares of the corporation. O'Shea and Schoenfeld were both directors and each held 25% of the shares. Frain was authorized to make day-to-day business decisions and all decisions affecting the normal operations of the corporation. The shareholder agreement further provided that major decisions required consent by 75% of the shares of the corporation, although certain decisions required a unanimous vote. Anything requiring a majority vote was required to have the approval of Frain and either O'Shea or Schoenfeld.

> The shareholder agreement set a specific salary formula for Frain during the first three years of the corporation. He was to receive $70,000 the first year with annual increases based on the Consumer Price Index (CPI). The salary provision expired in 1992. Frain continued in his position as Chief Operating Officer after the end of the three-year term, and increased his salary annually well above the CPI formula set by the initial salary provision. The shareholder agreement, however, also provided that "[n]o salaries, bonuses, or other compensation shall be paid to a shareholder . . . unless set forth herein or approved by a unanimous vote of the Board of Directors." O'Shea and Schoenfeld were aware that Frain was still receiving a salary, but at the time did not know of the salary increase.

> The shareholder agreement also prioritized distributions of corporate cash flow. Because it was a so-called "subchapter S corporation" (*see* 26 U.S.C. § 1361), income and taxes were passed through directly to the shareholders. The agreement designated the distributions in the following order: first, payments to the shareholders for payment of federal and state income taxes in proportion to ownership of shares of the corporation; second, payments of any outstanding shareholder loans; and third, payments of the balance to the

shareholders also in proportion to their ownership of shares. Frain made shareholder distributions-the third priority-before repaying shareholder loans. O'Shea and Schoenfeld protested but accepted and deposited their shareholder distributions.

230 F.3d at 1016. The analysis in *Frain*, transparently viewed, focuses solely on a "difference in knowledge or power between fiduciary and principal which ... gives the former position of ascendancy over the latter" [citing *Marchiando*, 13 F.3d 1111, 1116 (7th Cir.1994)]; 230 F.3d at 1017. Indeed, as quoted previously in this decision, *Marchiando* did discuss this concept. However, it is a mistake to read *Frain* as stating that a fiduciary relationship arises *solely* from difference in knowledge or power between one individual and another. *Frain* proceeds from the premise that a fiduciary relationship existed between the debtor and the person or entity seeking to assert that relationship under § 523(a)(4), from the debtor's control over an existing *res*—in *Frain*, the assets of a closely held corporation. In other words, it is not merely the differential in power or knowledge between two parties to a relationship that gives rise to a "fiduciary" relationship. *Frain* involved a closely-held corporation, in which the shareholder interests were held by three individuals, two of whom each had 25% interest, with Frain having a 50% essence totally controlling interest. The premise for *Frain* is stated as follows:

A "fiduciary duty" under this test covers circumstances which, although not comprising a literal "trust," do "call for the imposition of the same high standard." *See Marchiando*, 13 F.3d at 1115 (citing Restatement (Second) of Trusts § 2, comment b (1959)). For example, a lawyer-client relation, a director-shareholder relation, *or a managing partner-limited partner relation* all call for the

principal to "repose a special confidence in the fiduciary." *See id.*, 13 F.3d at 1116. (emphasis supplied)

230 F.3d at 1017. As *Frain* then explained:

A difference in knowledge or power can create a fiduciary relationship, *see Marchiando*, 13 F.3d at 1116. Frain was responsible for the day-to-day business decisions of the corporation, giving him a natural advantage over the other two shareholders in terms of knowledge of the corporation's finances. But it does not necessarily follow that this knowledge was unavailable to appellants. Indeed, it was no secret that Frain was drawing a salary after the initial three-year period, and the appellants themselves received and accepted shareholder distributions from Frain even though they were disgruntled because their loans were not repaid first. Frain's superior knowledge of day-to-day operations was not sufficient in itself to establish a position of ascendancy.

230 F.3d at 1017. Finally, the decision places the "ascendant" position of Frain in relation to his fellow shareholders in the following terms:

A Chief Operating Officer with 50% of the shares who cannot be removed for cause without his consent possesses a position of considerable ascendancy over the other shareholders. All of the decisions made in the ordinary course of business were Frain's to make. All of the major decisions required Frain's agreement. If Frain abused this power, termination for cause was a tantalizing, but unavailable fiction. This shareholder's agreement was not a system of checks and balances. Frain had more knowledge, and substantially more power, than appellants.

In this case, a fiduciary relationship was created by the structure of the corporation under the shareholder agreement, which had given Frain a position of ascendancy under our case law. Frain argues that violations of a contract entered into by equals are not covered by § 523(a)(4). However, Frain had a pre-existing fiduciary obligation to O'Shea and Schoenfeld independent of any breach of contract. This is not a case where a fiduciary relationship was implied from a contract. *See [In re] Bennett,* 989 F.2d [779] at 784 [(5th Cir. 1993)] (§ 523(a)(4) does not cover fiduciary duty implied from contract). A contract was necessary to the existence of a fiduciary relationship, but the obligations of the contract were not the source of the fiduciary relationship. The source of the fiduciary relationship was Frain's substantial ascendancy over O'Shea and Schoenfeld. Whether any alleged breach of contract was a defalcation is an issue for the bankruptcy court. We conclude, therefore, that based on the contract Frain possessed an ascendant position in relation to appellants. There was accordingly a fiduciary relationship for purposes of § 523(a)(4). The bankruptcy court must now decide whether Frain actually committed any defalcation under § 523(a)(4).

230 F.3d at 1018, 1019.

In this Court's view, *Frain* is based upon the premise that a "fiduciary" relationship existed between Frain and his two fellow shareholders—much as would be the case in the relationship among a managing partner and limited partners in a partnership—and that this relationship rose to the level of the "fiduciary capacity" required by 11 U.S.C. § 523(a)(4) *because of* the structuring of the relationship in a way which provided Frain with total control over the focus of the fiduciary relationship: existing assets of the corporation, and the manner in which the corporation would disburse monies on its obligations. Contrast that to the instant case. Under the principles of *Marchiando,* no possible "fiduciary" relationship arose in this case until Tsikouris failed to pay the "employer's component" obligations to the union benefit plans: the Plaintiffs had no interest of any kind in the proceeds or assets of Tsikouris' business until the debt asserted in this case arose, and when it did, their interest was merely a debt, as was true in *Marchiando.* Additionally, the "ascendancy of power/position" critical to the analysis in *Frain* does not exist at all here. The union benefit plans are associated with the union, and due to that association are far more powerful than is a small sole proprietorship which employs union members in its business. Unions have the ability to totally immobilize an employer who does not fulfill the terms of a collective bargaining agreement, and for the Plaintiffs in this case to suggest that Tsikouris was in a position of ascendant power over a trade union and its associated employee benefit plans borders on the preposterous.

 As the foregoing cases establish, a critical component of a fiduciary relationship within the scope of 11 U.S.C. § 523(a)(4) is a *res* which exists as the focus of the relationship, much as would be the circumstance in the case of an express trust created to manage property deposited into the trust at the inception of the fiduciary relationship; *See, Klingman v. Levinson,* 831 F.2d 1292, 1295 (7th Cir. 1987). A mere promise to pay a debt when circumstances giving rise to the obligation to pay come into existence, made by an individual to another person or entity of equal or superior standing, is not within the ambit of 11 U.S.C. § 523(a)(4); *In re Woldman,* 92 F.3d 546 (7th Cir.1996). Even if a statute or ordinance labels a

relationship to be a "fiduciary" relationship, that label has no consequence under § 523(a)(4) unless there is an existing *res* which is mandated by law to be the subject of the labeled relationship; *In re McGee*, 353 F.3d 537 (7th Cir.2003) [holding that a municipal ordinance which required the deposit of security deposits paid by tenants to a landlord into a segregated account, created a "fiduciary" relationship under 11 U.S.C. § 523(a)(4), in specifically delineated contrast to the circumstances outlined above in *Marchiando, surpa.*]

Case-by-case review of the authorities cited by the Plaintiffs is unnecessary. The United States Court of Appeals for the Seventh Circuit, and more importantly the United States Supreme Court, have determined the issues presented by the Plaintiffs in this adversary proceeding against them.

The principle which the Plaintiffs assert in this case is essentially that an individual who enters into a contract to make payments to an ERISA-qualified fund when the conditions giving rise to the payment obligation arise, commits "fraud or defalcation while acting in a fiduciary capacity" when he breaches his contractual obligation to make payments to that fund. This is not a position which this Court will endorse as being in consonance with controlling precedents. Moreover, the endorsement of this position may creates a class of creditors whose ability to except a mere promise to pay an indebtedness from discharge derives *solely* because the party with whom the debtor contracted required that payments be made to an ERISA-qualified employee benefit plan. There is no principle in the law under 11 U.S.C. § 523(a)(4) which elevates an employer's promise to pay an ERISA-qualified fund a debt for the "employer's component" share of plan contributions, above that same employer's promise to pay any other debt

which it owes. Somewhat analogously, employers are required by federal statutory law to pay a contribution on behalf of an employee's FICA account which matches the contribution made by the employee from withheld wages. These "employer component of FICA" obligations have a certain priority under the Bankruptcy Code [11 U.S.C. § 507(a)(8)(D)], and are to a certain extent excepted from discharge [11 U.S.C. § 523(a)(1)(A)]. But no one would suggest—not even, trust me, the IRS—that unpaid "employer component" contributions to the Social Security Trust Fund are subject to the provisions of 11 U.S.C. § 523(a)(4).

Based upon the foregoing, the Court determines that the debt or other obligation of the debtor Anthony Pete Tsikouris to the plaintiffs Allan Delange, Chairman and William Blumm, Secretary, on Behalf of Northwest Indiana Painters Welfare Fund; James Mitchell Sr., Chairman and John Arvin, Secretary, on the Behalf Of the Northwest Indiana Painters Joint Apprenticeship & Training Trust Fund, at issue in this adversary proceeding, is *not* excepted from discharge by operation of 11 U.S.C. § 523(a)(4).

IT IS ORDERED, ADJUDGED AND DECREED that any debt or other obligation of the debtor Anthony Pete Tsikouris to the plaintiffs Allan Delange, Chairman and William Blumm, Secretary, on Behalf of Northwest Indiana Painters Welfare Fund; James Mitchell Sr., Chairman and John Arvin, Secretary, on the Behalf Of the Northwest Indiana Painters Joint Apprenticeship & Training Trust Fund, at issue in this adversary proceeding, is not excepted from discharge under 11 U.S.C. § 523(a)(4).